OPINION
Defendant-appellant Dewey T. Goss II appeals from his conviction and sentence for Grand Theft and Possession of Criminal Tools, following his no contest plea to those charges. Goss argues that the trial court erred by overruling his Motion to Suppress, because the police lacked reasonable suspicion to stop and question him, and lacked probable cause to arrest him.
We conclude that while the police had reasonable, articulable suspicion to make a brief investigative stop of Goss, they lacked probable cause to place him under arrest. Therefore, the trial court should have granted Goss's Motion to Suppress evidence seized pursuant to his arrest. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
 I
At approximately 12:45 a.m. on the morning of December 23, 1997, Lieutenant Greg Johnson, and Deputies Jerry Berry and Tina Waymire, of the Miami County Sheriff's Office, were dispatched to the Nashville Church, located at the corner of Wheelock Road and State Route 571, to investigate a suspicious-looking vehicle parked at the cemetery there. Because a "rash of breaking and enterings" of "barns and outbuildings" had occurred in the area, the deputies set up a parameter around the U-Haul truck. At approximately 1:30 a.m., Deputy Waymire observed two men walk up to the U-Haul truck. Suddenly, the two men ran off in opposite directions. One, Robert A. Butt, Jr., ran almost directly into Lieutenant Johnson and Deputy Berry; Butt was apprehended and placed into custody. The other man escaped. Butt told the deputies that the U-Haul truck had broken down, and that his friend, William Hussey, had left to get help.
Detectives Dave Duchak and Billie Ray were called to the scene to help in the investigation. Upon their arrival, Lieutenant Johnson told Duchak about the U-Haul truck parked in the back of the cemetery, and a John Deer tractor that "was recovered along side Wheelock Road at the cemetery entrance." The detectives transported Butt to the Miami County Jail, where they seized from him a pair of brown Jerzee gloves and a pager. The detectives also noticed dirt on Butt's pants and shoes. The detectives returned to assist in the search for the remaining suspect.
The detectives had learned that Butt was from Dayton, and assumed that the other suspect would be from Dayton, too. Since the U-Haul truck was in police custody, the detectives figured the suspect would be searching for a pay telephone so that he could obtain a ride home. Consequently, the detectives began searching local gas stations and other establishments that were open for business.
At approximately 5:30 a.m., the detectives arrived at the Tipp O' the Town Restaurant in Tipp City. Looking through the glass entrance door, the detectives observed a white male, later identified as Goss, using a pay telephone. Duchak observed that Goss had dirt on his pants and shoes. Duchak approached Goss, identified himself as a deputy sheriff, and told Goss to hang up the telephone. Goss ignored Duchak, refusing even to acknowledge his presence. Duchak asked Goss several times to hang up the phone, but to no avail. Eventually, Detective Ray came over, and asked Goss several more times to hang up the phone. Finally, Goss hung up the phone.
When Duchak then asked Goss for identification, he noticed a pair of brown Jerzee gloves, indentical to the ones worn by Butt, protruding from one of Goss's pockets. When Duchak asked Goss why he was on the telephone, Goss replied that he was calling his mother because his car had broken down in Dayton. When Duchak asked Goss why he was in Tipp City if his car had broken down in Dayton, Goss replied that a friend had given him a ride there. When asked about the dirt on his pants and shoes, Goss explained that he had been walking in a ditch line. When Duchak asked Goss "who his friend was," Goss answered, "maybe I shouldn't answer any more questions without an attorney." Duchak noticed that Goss was "acting very nervous," and his cheeks were "rosy red," indicating that he had been "outside for a little while." Duchak handcuffed Goss, frisked him for weapons, and informed him that he was being detained for investigative purposes. After Goss had been taken to the police cruiser, the pay telephone rang, and Detective Ray answered it; the caller was Goss's mother.
Goss was transported to the Miami County Sheriff's office. While there, the detectives learned that fourteen of the fifteen calls on Butt's pager were to the telephone number of Goss's mother. At that time, Goss was advised that he was under arrest.
Goss was indicted for Grand Theft and Possession of Criminal Tools. He moved to suppress all evidence obtained as a result of his stop and arrest, including any statements made to the detectives. A hearing was held on Goss's motion on May 4, 1998. The only witness presented was Detective Duchak, who testified to the facts related above.
The trial court overruled Goss's motion, stating that "[w]hat Goss perceives as a trampling of his constitutional rights[,] the Court perceives as a classic example of excellent `gumshoes' work." The trial court stated that the John Deer tractor had been found inside the U-Haul, even though Duchak had indicated that the U-Haul had been parked in the back of the cemetery, while the John Deer tractor had been "recovered along side Wheelock Road at the cemetery entrance." The trial court also found that the tractor had been stolen, even though no testimony had been presented to support that finding. Additionally, the trial court found that Detective Duchak "asked" Goss to hang up the telephone when he approached him, despite the fact that Duchak had actually testified that he "told him to hang the phone up. Um, I asked him to hang the phone up several times." (Emphasis added.)
The trial court held that the encounter between the detectives and Goss was consensual up until the time Duchak handcuffed Goss, and informed him that he was being detained for investigative purposes. The trial court stated that the only evidence suggesting a show of authority prior to that time occurred when Duchak "asked" Goss to hang up the telephone. However, the trial court found that the detective's "request" was not "characterized as a threat," nor "accompanied by any physical activity," and that, therefore, Goss was not left with the impression that he was not free to leave. The trial court further noted that, while reasonable suspicion is not necessary to justify a consensual encounter, the detectives nevertheless had reasonable suspicion to believe that Goss was involved in criminal activity at the time they first approached him, given his location, the condition of his clothes, his gender, and the time of morning in relationship to the crime.
Finally, the trial court determined that the facts the detectives learned while observing Goss after he had hung up the telephone, but before the detectives had handcuffed him, i.e.,
Goss's brown Jerzee gloves, nervousness, red cheeks, and suspicious story, provided the detectives with probable cause to believe that Goss was the other suspect who had fled from the "crime scene" several hours earlier.
Following the denial of his Motion to Suppress, Goss pled no contest to the charges against him, and the trial court sentenced him accordingly. Goss appeals from the trial court's judgment.
 II
Goss assigns the following as error:
 I. THE TRIAL COURT ERRED IN OVERRULING A MOTION TO SUPPRESS THE EVIDENCE OBTAINED DURING THE COURSE OF A DETENTION WITHOUT REASONABLE SUSPICION OF CRIMINAL ACTIVITY.
 II. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS AS THE ARREST WAS WITHOUT PROBABLE CAUSE.
Goss essentially argues that the trial court erred in overruling his Motion to Suppress, because the police had neither reasonable suspicion to stop and question him, nor probable cause to arrest him.
The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee a person's right against "unreasonable searches and seizures." Not all encounters between law enforcement officers and citizens implicate the Fourth Amendment's guarantees, however. State v.Taylor (1995), 106 Ohio App.3d 741, 747. A police officer may approach a citizen in a public place, engage him in conversation, request information, or even request permission to examine his identification or belongings, all without implicating the citizen's Fourth Amendment rights, so long as the person is free not to answer the police officer's questions or respond to his requests. Id. at 747. Any voluntary responses given by the person during these types of "consensual" police-citizen encounters may be used against him in a subsequent criminal prosecution. Id. at 749.
The protections of the Fourth Amendment are only implicated when a police officer restrains a person's liberty by physical force, or by a show of authority that would cause a reasonable person to believe that he was not free to decline the officer's request or otherwise walk away. Id. at 747-748. When a person's liberty is so restrained, he has been "seized" for purposes of theFourth Amendment. Any evidence obtained from the person seized during the encounter, including any statements he makes to the officer, and any observations the officer makes about him, will be inadmissible in a subsequent criminal trial, unless the officer possessed the requisite level of suspicion at the time the seizure occurred. See Id. at 749.
The level of suspicion required is dependent upon both the duration and scope of the seizure involved. A police officer who has "reasonable articulable suspicion" that criminal activity is afoot is permitted to make a brief investigative "stop" or detention of a person who appears to be involved in the criminal activity. Id. at 748-749. However, the investigative stop or detention must be limited in duration and scope, and can last only as long as necessary for the officer to confirm or dispel his suspicions. Id. at 748.
A police officer who has "probable cause" to believe that a person has committed a crime is permitted to arrest that person. Probable cause exists when the arresting officer has sufficient information derived from a reasonably trustworthy source to warrant a prudent person in believing that a crime has been committed, and that the person to be arrested has committed that crime. State v. Timson (1974), 38 Ohio St.2d 122, paragraph one of the syllabus.
Here, Detective Duchak testified that when he initially approached Goss, he "told him to hang the phone up. Um, I asked him to hang the phone up several times." Duchak stated that Goss just ignored him, and did not even acknowledge his presence. Duchak testified that Detective Ray came over at that point, and "again asked him several more times to hang the phone up." The trial court did not comment on the conflicting testimony regarding whether Duchak "told" or "asked" Goss to hang up the telephone, or the testimony that both detectives had asked Goss repeatedly to hang up the telephone. Instead, the trial court found simply that Duchak "asked him [Goss] to hang up the telephone. The subject initially did not comply, but ultimately hung up the telephone * * *." The trial court concluded that the encounter between Goss and the detectives was consensual up until the time the detectives handcuffed Goss. We disagree.
As an initial matter, if Duchak "told" Goss to hang up the telephone, then this would have constituted an order or command that no reasonable person in Goss's position would have believed he was free to ignore. Nevertheless, even if Duchak initially told, rather than asked, Goss to hang up the telephone, Goss did not immediately comply with that order or command; instead, he ignored Detective Duchak. When a person does not submit to a show of authority, he has not been "seized" for purposes of theFourth Amendment. California v. Hodari D. (1991), 499 U.S. 621, 626.
However, Detective Duchak also testified that Goss did not hang up the telephone until after he, and then Detective Ray, had "asked" Goss, several times each, to do so. The trial court essentially found that a reasonable person in Goss's position would have believed he was free to continue to ignore the detective's requests. We disagree. By repeatedly asking Goss to hang up the telephone despite his attempts to ignore them, the detectives made it clear that they were not going to take "no" for an answer. No reasonable person in Goss's place would have felt free to ignore the detectives' repeated requests to hang up the telephone. See United States v. Jerez (C.A. 7, 1997),108 F.3d 684, 692 (defendant was "seized" when police knocked on his motel window for three minutes, since no reasonable person would have felt free to leave under the circumstances). Thus, Goss was "seized" for purposes of the Fourth Amendment when he finally complied with the detectives' repeated requests to hang up the telephone. The question then becomes whether the detectives had, at least, reasonable articulable suspicion to justify their initial stop of Goss.
The police were aware that a rash of breaking and enterings of barns and "outbuildings" had occurred in the area where they found the suspicious looking U-Haul truck. The truck was parked in the back of the cemetery, and a John Deere tractor was found near the cemetery's entrance. Two men walked up to the truck, and then suddenly fled in opposite directions. These events occurred at 1:30 a.m. These circumstances, viewed in their totality, provided the police with reasonable articulable suspicion to believe that criminal activity was afoot. See State v. Andrews
(1991), 57 Ohio St.3d 86, 88-89 (experienced police officer who saw suspect in a high crime area, at night, running away from a police cruiser and towards him, and throwing down a beer can once the officer shined a flashlight on him, had reasonable suspicion to make an investigative stop).
The U-Haul truck was parked in the vicinity of a target of opportunity (the John Deere tractor). The two men walked up to the U-Haul truck, thereby indicating that it belonged to them. Furthermore, their running away in different directions suggests that they were fleeing to escape getting caught engaging in criminal activity. These facts, coupled with the rash of breaking and enterings of barns and outbuildings that had been occurring in the area, provided the police with sufficient facts to briefly detain the two men in order to confirm or dispel their suspicions. As noted, the police apprehended one of the suspects (Butt) at the scene. The next question that must be answered is whether the police had reasonable suspicion to believe that the white man they saw standing at the pay telephone (Goss) was, in fact, the other suspect who had fled.
First, it was reasonable for the police to assume that the other suspect was, like Butt, from Dayton, and would, therefore, head for a pay telephone to try to obtain a ride home, since Butt had confirmed that he and the other suspect were using the U-Haul for transportation. The detectives did, in fact, find Goss using a pay telephone at 5:30 a.m., in a Tipp City restaurant near I-75, which leads to Dayton. The restaurant is about five miles from the cemetery where the two men had been first observed. While these facts may have had far less significance if the events had occurred on the afternoon of December 23, rather than in the early morning hours of that day, Goss's use of a pay telephone at 5:30 a.m., at a restaurant near an interstate highway leading to his probable destination (Dayton) are factors that the police reasonably considered in searching for the missing suspect.
Furthermore, when Detective Duchak saw Goss at the pay telephone, he noticed that Goss, like Butt, had dirt on his pants and shoes. Goss contends that the amount of dirt he had on his pants and shoes was far less than the amount the police should have suspected given the fact that the man who fled would have had to have walked five miles over open country, avoiding roads like State Route 571 in order to escape detection. However, these events occurred in late December, at a time when the ground would have been hard and firm, not muddy. Indeed, the testimony indicated that the temperature was in the thirties, with a windchill in the twenties. It was reasonable for the detectives not to assume that the suspect they were searching for would be "covered" with mud.
Additionally, the four hours that expired between the time the deputies saw the two men fleeing from the cemetery and the time the detectives saw Goss using the pay telephone at the restaurant in Tipp City would have been consistent with a person who had to make his way over open country, on foot, in unfamiliar territory, searching for a pay telephone, in the early hours of a winter morning. In light of the foregoing, the police had reasonable suspicion to believe that the man standing at the pay telephone in Tipp City was the other suspect who had fled. The remaining question is whether, when the police arrested Goss, they had probable cause for the arrest.
After Goss hung up the telephone in response to the detective's repeated requests, Detective Duchak noticed that Goss was carrying a pair of brown Jerzee gloves, similar to the ones seized from Butt; that his cheeks were rosy red, indicating that he had been outside; and that he was nervous.[1] All of these facts provided further confirmation of the detectives' suspicions that Goss was the suspect who had fled earlier. Furthermore, the fact that Goss had a pair of gloves matching those worn by Butt indicate potential conspiratorial activity between the two. Nevertheless, in order for the detectives to have validly placed Goss under arrest, they needed to demonstrate that they had probable cause to believe that Goss and Butt had committed a crime. While the evidence presented by the State at the suppression hearing showed that the detectives had reasonable suspicion to believe that criminal activity was afoot at the cemetery, the evidence does not meet the higher standard for probable cause needed to justify an arrest.
As a threshold matter, there is some dispute in this case as to the exact point in time when Goss was placed under arrest. Detective Duchak testified that when he handcuffed Goss and placed him in the cruiser, he told Goss that he was being detained for investigative purposes. Duchak testified that after he transported Goss to the Sheriff's office, he discovered that fourteen of the fifteen calls on Butt's pager were to the telephone number of Goss's mother. At that time, Duchak advised Goss that he was under arrest. The State contended that Goss was not placed under arrest until Detective Duchak so advised Goss. The trial court rejected that contention, noting that when Goss was handcuffed and placed in the police cruiser, Goss's "freedom of action [was] restrained to a degree associated with formal arrest." We agree with the trial court in this regard. See Katz,Ohio Arrest, Search and Seizure (1998) 100, Section T 4.02 ("[t]here is no difficulty in identifying an arrest when a suspect is handcuffed, detained for a lengthy period of time, and placed in a squad car or removed to the police station").
Consequently, the detectives needed to demonstrate that they had probable cause to believe that Goss had committed a crime at the time they handcuffed him, placed him in the police cruiser, and transported him the Sheriff's Office. Moreover, even if we assume that Duchak did not place Goss under arrest until after he learned that Butt's pager contained the telephone number listed for Goss's mother, it would not change the result in this case. That information merely confirmed that Goss was the second suspect in the case. The State failed to present sufficient evidence at the suppression hearing to demonstrate that a reasonable person would believe that Butt and Goss had committed a crime.
The trial court found that the John Deere tractor was found inside the U-Haul truck. However, there is no evidence in the record to support that finding. Duchak testified that the U-Haul truck was parked in the back of the cemetery, and the John Deere tractor was recovered near the front entrance to the cemetery. No testimony was presented regarding the actual distance between the truck and the tractor. Furthermore, no testimony was presented showing that Butt or Goss had ever approached the John Deere tractor, let alone moved it into its position at the cemetery's entrance.
The trial court also referred to the area from which Butt and Goss were seen fleeing as the "crime scene." However, there was insufficient evidence presented to show that a crime had taken place. It seems to have been an unspoken assumption, at the suppression hearing, that a crime had occurred, or was occurring, at the cemetery, but the evidence upon which this assumption may have been based did not find its way into the record. Detective Duchak did cite "the B and E [breaking and entering] that had just went on" as one of his reasons for placing Goss in "investigative detention." However, while Duchak may have been referring to the John Deere tractor when he spoke of the breaking and entering that had just occurred, the detective provided no testimony indicating that the John Deere tractor had been confiscated as a result of a breaking and entering. More importantly, the State failed to provide sufficient evidence establishing a link between Butt and Goss, and the John Deere tractor. Although the presence of the tractor at the front entrance of the cemetery looked suspicious, particularly in light of the rash of breaking and enterings of barns and outbuildings that had been occurring in the area, it could not have provided the police with probable cause to believe that a crime had been committed by the two men.
In summation, the State's evidence showed that: (1) there had been a rash of breaking and enterings of barns and outbuildings in the area; (2) two men walked up to a U-Haul truck parked behind the cemetery; (3) there was a John Deere tractor at the front entrance to the cemetery; and (4) the two men suddenly fled in opposite directions. While these facts provided the detectives with reasonable suspicion to believe that criminal activity was afoot, they were insufficient to provide the detectives with probable cause to believe that a crime had been committed by the two men. Accordingly, the trial court erred by not suppressing the evidence obtained by the police after Goss was handcuffed and placed in the cruiser.
Although Goss did not make any statements to the detectives after he was handcuffed, the detectives seized Goss's own pager, as well as his pants, shoes, gloves, and, perhaps, his jacket, pursuant to a search incident to their unlawful arrest. On remand, all of this evidence must be suppressed. On the other hand, the detectives may testify about any statements Goss made to them, and any observations they made about Goss, before they handcuffed him.
In light of the foregoing, Goss's First Assignment of Error is overruled, and his Second Assignment of Error is sustained to the extent indicated.
 III
Goss's First Assignment of Error having been overruled, and his Second Assignment of Error having been sustained, the judgment of the trial court is Reversed, and this cause is Remanded for proceedings consistent with this opinion.
BROGAN and WOLFF, JJ., concur.
Copies mailed to: James D. Bennett, Terry L. Lewis, Michael A. Marrocco Hon. Robert Lindeman.
[1] It should be emphasized that the detectives did not observe these facts until after Goss had complied with their repeated requests to hang up the telephone, and, therefore, was "seized" for purposes of the Fourth Amendment. Thus, these observations could not be used to validate the investigative stop, since they resulted from the stop.