OPINION
Defendant-Appellee Willie H. Clark was indicted on August 21, 1999 for possession of six thousand grams of cocaine. On September 22, 1999, Clark filed a motion to suppress physical evidence and statements sought to be introduced by the State. A hearing was held on January 8, 2000 in which Detectives Bollinger and Logan of the Dayton Police Department, and Officer Matson of the Houston, Texas Police Department testified. Subsequently, the trial court sustained the motion, suppressing the drugs found and the statements made by Clark. The State has appealed this decision raising the following assignments of error:
 The trial court erred in finding that Detective Bollinger did not have reasonable, articulable suspicion to justify an investigative detention.
 The trial court erred in granting Defendant's motion to suppress evidence seized when Clark voluntarily consented to the search of the suitcase in which the evidence was found.
The facts of this case begin on August 19, 1999 at the airport in Houston, Texas. Officer Patti L. Matson was watching flights coming in from Cleveland, Ohio because she had recently handled several arrests for carrying drugs to or from Cleveland. At approximately 5:30 P.M., Officer Matson noticed Clark exit a Cleveland flight, walking rapidly and looking around very nervously. He was carrying one small carry-on bag and was heading toward baggage claim. Once he arrived at baggage claim, he waited for approximately five minutes, and without claiming any luggage, left the area and made a phone call from a pay phone. From there, he walked outside to the passenger pick-up area and began pacing back and forth. After a few moments, he headed toward the taxi pick-up area.
At this point, Officer Matson approached Clark and identified herself as a Houston Police Officer and showed him her badge and I.D. She asked Clark if he minded speaking with her and he agreed. First, Matson asked if he was coming to or leaving Houston and he advised her that he had just arrived from Columbus, Ohio. She then asked to see his airline ticket, which he produced. The ticket revealed that it was an open-ended ticket that originated in Dayton, Ohio, through Cleveland to Houston. Additionally, it was purchased the day before for more than $1000. Next, Matson asked to see Clark's driver's license, which he also produced. It verified his name was Willie H. Clark, just as indicated on the airline ticket, and that he was born in the 1940's.
Matson then began questioning Clark about his plans while in Houston, whether they were business or pleasure. Clark explained he was in town to visit friends for a couple days. When asked his friends' names, he did not respond, and when asked where they lived, he admitted he did not know. Following this discussion, Matson advised Clark she was a narcotics officer and asked if anyone had asked him to carry anything on his person or in his bag. He responded that they had not. After verifying the carry-on was his only luggage, she asked if she could look inside the bag, explaining that he did not have to allow it. He responded that was fine. Inside the bag, Matson found one change of clothes, a $44 canceled check stub and some prescription medication. She then asked if he would allow another officer to pat him down. Again, he agreed, and nothing was found on his person. At this time, the conversation ended. Although Clark was very nervous at the beginning of the conversation, Matson indicated that he calmed down a bit toward the end.
The following day, Matson checked the Continental Airline computer and found that Clark had booked his return flight for August 21, 1999, the next day. Matson then contacted Kevin Bollinger of the Dayton Interdiction Unit and advised that she had a suspicious individual returning to Dayton the following day, and asked if he wanted to investigate him as he came into Dayton. Bollinger agreed.
On August 21, 1999, Officer Matson determined that Clark had checked a piece of luggage with the airline for his return trip. She found out his bag tag number and located the suitcase. It appeared to be a brand new Bovano brand suitcase with no personal identification, other than the computer-generated airline tag. She then lifted the suitcase to see how heavy it was and guessed it was about twenty pounds.
Thereafter, Matson proceeded to the gate and spotted Clark awaiting his flight. She noticed that he was again nervous, fidgeting in his seat, and took note of his clothing to report to the Dayton Police. Once Clark's flight departed, Matson contacted Bollinger and advised that Clark was in the air, described what he was wearing, and gave him the bag tag number of his new suitcase.
Matson explained that she did not stop Clark in the Houston Airport before he departed because there was a greater potential for catching the buyer in Dayton, than the seller in Houston. If Clark were carrying drugs, once he arrived at the Houston Airport to return to Ohio, it would be too late to catch the individual from whom he obtained the drugs. However, there would be a potential for police in Dayton to catch the buyers through Clark since the contraband would not yet have been delivered. Therefore, she allowed him to get on the plane and have the Dayton Police handle the situation.
Back in Dayton, Detective Bollinger called Franklin County to check Clark's record and found that he had an extensive criminal background, including a couple of drug arrests. Prior to Clark's arrival, Bollinger located a narcotics dog to sniff Clark's luggage. When Clark's plane landed, Detective Logan watched him disembark the plane, while Detective Bollinger was in the luggage area with the narcotics dog. Once Bollinger located the suitcase matching the description and the bag tag number obtained from Officer Matson, he pulled that bag and four others for the dog to sniff. However, the dog did not positively alert on any of the luggage. Bollinger testified that this result did not "faze" him because often narcotics are packed such that the odor is completely masked so that a drug dog would not be able to detect it. Subsequently, he returned the luggage to the carousel to proceed to baggage claim.
Meanwhile, Clark had also made his way to baggage claim. At the same time, Detective Bollinger met up with Detective Logan to inform him the dog had not alerted on the suitcase. As soon as Clark claimed his bag, he proceeded out the doors to the sidewalk. Immediately after exiting the doors, Detective Bollinger approached Clark, identified himself and told him he needed to talk to him for few minutes. He then introduced Detective Logan who was standing a few feet away.
Detective Bollinger began the conversation by asking Clark if the Bovano suitcase was his, to which he responded it was. He then asked if he had packed it himself. Clark replied that he was not aware what the contents were. Bollinger requested to see Clark's driver's license, which he produced. At this point, Bollinger advised Clark that since he was not aware of the contents of his luggage and since Bollinger believed there were narcotics in the bag, "he was gonna [sic] have to accompany us back to the Airport Police Office." Clark did not respond, but went along with the detectives. Bollinger testified that Clark was not under arrest at this point, but he was also not free to leave. As to the suitcase, Detective Bollinger carried it to the point of the metal detectors, then Detective Logan carried it the rest of the way to the police office in Terminal B.
Once in the police office, which resembled a small classroom, Bollinger reviewed a pre-interview rights form with Clark. Following each right, Clark confirmed he understood and initialed that right. After all of the rights were read, Bollinger reviewed the waiver of rights portion and Clark signed the form, agreeing to speak with the detectives. Shortly thereafter, Bollinger advised Clark that they had two options on which way they could go, he could either consent to the search of his suitcase, or Bollinger could obtain a warrant for the search. Clark immediately gave consent and signed the consent to search form.
Upon opening the suitcase, Detective Bollinger found two packages wrapped in smiley face wrapping paper. Underneath the wrapping paper were two checkers boxes which each contained three kilograms of cocaine wrapped approximately three quarters inch thick with cellophane and dryer sheets. Clark was then arrested for possession. An attempt was made by the detectives to set up a controlled buy with Clark, but ultimately, Clark decided against it.
 I.
In its first assignment of error, the State argues that the trial court erred by not finding that Detective Bollinger had articulable, reasonable suspicion to justify an investigatory detention. In addition, the State takes issue with the trial court's finding that the seizure of Clark amounted to an arrest as opposed to an investigatory detention. We will address this issue first.
Both parties agree that the stop surpassed a consensual encounter and amounted to a seizure. Unfortunately, there is no bright line test to determine when a seizure by police has crossed the line from an investigatory detention, which requires reasonable, articulable suspicion, to an arrest, which requires probable cause. Florida v.Royer (1983), 460 U.S. 491, 506-07. Each case will present a different combination of facts which must be examined to determine the level of the seizure. Id. Moreover, there are factors to be considered which indicate the seizure has risen to an arrest, including: "(1) there is an intent to arrest, (2) the seizure is made under real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested." Statev. Taylor (1995), 106 Ohio App.3d 741, 749, citing State v. Barker
(1978), 53 Ohio St.2d 135, syllabus.
In Royer, an individual in the airport to board a plane was stopped by police because he fit several characteristics of the drug courier profile. After requesting to see his airline ticket and his driver's license, the officers informed him that they were narcotics detectives and had reason to suspect him of transporting narcotics. Without returning his airline ticket or his license, they asked him to accompany them to a small room adjacent to the concourse. Meanwhile, another detective retrieved his luggage from the airline and brought it to the room. The United States Supreme Court found that this amounted to an arrest because (1) the detectives identified themselves as narcotics detectives and advised Royer he was suspected of transporting narcotics, (2) Royer was in a small enclosed area confronted by two officers, and (3) the detectives retained possession of his airline ticket, driver's license and luggage without indicating in any way he was free to depart.Id. at 501-02.
In a case with similar facts, the Supreme Court found that stopping the individual only amounted to an investigatory detention. United Statesv. Mendenhall (1980), 446 U.S. 544. Detectives stopped Mendenhall as she exited a plane because she fit several drug courier characteristics, and asked to see her airline ticket and license. In this case, however, the detectives returned her ticket and license before asking her to accompany them to the security office. The trial court in Mendenhall found the stop to be an investigatory detention, whereas the Court of Appeals held it to be an arrest. Id. at 557. The Supreme Court held that "because the trial court's finding was sustained by the record, the Court of Appeals was mistaken in substituting for that finding its view of the evidence."Id.
Although it was not an issue in the case, United States v. Sokolow also involved an investigatory stop at an airport. (1989), 490 U.S. 1. A DEA agent approached Sokolow as he was trying to hail a cab after arriving in Honolulu. The agent grabbed him by the arm and moved him back onto the sidewalk. Subsequently, the officer asked for an I.D. and his airline ticket, but he had neither. Sokolow and his companion were then accompanied to the DEA office where a drug dog alerted on his shoulder bag. It is not clear from the opinion whether the agents requested or demanded that Sokolow accompany them to the DEA office, only that he did. The issue was not raised whether these actions amounted to an arrest, instead, it was agreed the stop was an investigatory detention.Id.
The State argues that removing Clark to the airport police office is equivalent to placing a suspect in the back of a police cruiser, which we have held does not necessarily constitute an arrest. State v.Broomfield (Sept. 13, 1996), Clark App. No. 95-CA-0103, unreported, at p. 6. In Broomfield, we stated that in order for a seizure to rise to the level of an arrest, it "must involve a clear and unequivocal deprivation of liberty for the purpose of instituting criminal charges."Id. We found that placing Broomfield in the cruiser for twenty-six minutes while awaiting a drug dog was not an arrest, as no weapons were displayed and she was not handcuffed or physically restrained. Id.
 After reviewing the above precedent, we must find the distinguishing factors of Royer, where it was found an arrest had occurred, and the other cases which only involved an investigatory detention, and then compare those facts to the present case. In Royer, as well as Mendenhall, the officers asked the individual to accompany them to the airport police office, whereas Detective Bollinger testified he told Clark "since he wasn't aware of the contents of his piece of luggage, and that I believed that there was narcotics in the bag, he was gonna [sic] have to accompany us back to the Airport Police Office . . ." Royer and the present case are similar in that the detectives in both situations took possession of the suspect's luggage, however in Royer, they also appropriated his driver's license and airline ticket. This last factor leads us to what we believe is the most critical distinction between Royer and the present case.
The detectives in Royer stopped the defendant after he had checked in with the airline, but before he was able to board his flight, confiscating his driver's license and airline ticket and retrieving his luggage from the airline. In doing so, the detectives prevented Royer from boarding his flight, completely impeding his ability to travel. We find this to be much more intrusive than stopping an individual who has completed his flight and is simply proceeding to the parking lot. We further find it more intrusive to take possession of an individual's airline ticket and driver's license prior to boarding a flight, than just his luggage after his flight is completed. Accordingly, we find this case to be more similar to Mendenhall and Sokolow where the Court found the seizure to be an investigatory detention. In Mendenhall, the officers stopped her after she exited a plane and asked to see her license and ticket, but immediately returned these items to her before proceeding to the airport security office. By not confiscating the airline ticket, they did not completely impede her ability to travel as the officers did in Royer. Even considering Bollinger's choice of words which seemed more of a demand than a request to accompany them back to the police office, this still does not cause the encounter to rise to the level of intrusion as found in Royer.
Furthermore, when examining the factors listed in Taylor, there was clearly no intent by Detective Bollinger at the time of the stop to arrest Clark. Although he had several factors which gave reasonable suspicion to stop him, he did not pretend to have probable cause to arrest at that point. Likewise, there was no evidence that Clark thought he was being arrested at that time. Based on the above analysis, we find that the trial court erred in holding that the initial stop of Clark amounted to an arrest. Instead, the stop constituted an investigatory detention as defined in Terry v. Ohio (1968), 392 U.S. 1.
Moving onto the State's main argument in this first assignment of error, we must determine if the detectives were justified in making the investigatory stop. Such a stop is justified if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Statev. Retherford (1994), 93 Ohio App.3d 586, 595, citing Terry, supra, at 21.
Again we will examine the facts of several similar cases to determine whether Detective Bollinger had a reasonable, articulable suspicion to stop Clark. The United States Supreme Court has held that the fact that details leading to reasonable suspicion are set forth in a drug "profile" does not lessen their evidentiary significance. Sokolow, supra, at 10. In State v. Taylor, this court found that the following factors were sufficient to establish reasonable suspicion: the individual was poorly dressed, visibly very nervous, acted as if he did not know his traveling companion, lied about traveling alone, and was flying under an assumed name. Taylor, supra, at 752. The United States Supreme Court upheld a finding of reasonable suspicion when an individual paid $2100 in cash for two open-ended airline tickets, traveled under an assumed name, stayed forty-eight hours at his destination when the round-trip flight lasted twenty, appeared very nervous throughout the trip, and checked none of his luggage. Sokolow, supra. Even fewer characteristics supported a finding of reasonable suspicion in Mendenhall, including acting very nervous, not claiming baggage, changing airlines at a layover, and flying under an assumed name. Mendenhall, supra.
In the present case, Detective Bollinger possessed the following information at the time he stopped Clark: (1) Officer Matson had advised him that Clark was acting very nervous in the Houston Airport when he disembarked the plane. (2) He did not claim any luggage though he carried only one small carry-on bag. (3) When Officer Matson spoke with Clark, he explained he was in town to visit friends, but did not name the friends, nor was he able to tell her where they lived. (4) Clark paid over $1000 cash for an open-ended ticket purchased one day before he departed. (5) His flight left from Dayton with a layover in Cleveland even though there are direct flights out of Columbus, his home town. It has been said that drug couriers tend to avoid their home airports, flying instead out of airports nearby. See Broomfield, supra, at p. 1. (6) Even though he said he was in Houston to visit friends for a couple days, Clark booked his return flight to leave less than forty-eight hours after he had arrived in Houston. (7) When he checked in for his return flight, he checked a brand new suitcase and did not have the same carry-on bag he had when he arrived; (8) Once in Dayton, when asked if he packed his own bag, Clark responded that he was not aware of its contents.
One piece of evidence relied on heavily by the trial court is the drug dog's failure to alert. Although this does not help the State's case, we do not feel that it weighs as a factor against the State. When a drug dog fails to alert, it simply means that he cannot smell the drugs, not that they are not present. The failure to alert does not negate all of the other drug courier characteristics that are present, preventing an officer from further investigation. Instead, it should simply be a neutral factor for the State when considering whether the officer had reasonable, articulable suspicion to stop, or as will be discussed later, probable cause to obtain a search warrant. See State v. Wilkins
(June 19, 1998), Montgomery App. No. 16817, unreported (finding probable cause existed for search warrant even in light of a drug dog's failure to alert on package).
After reviewing all of the data available to Detective Bollinger, it was clearly sufficient to establish reasonable suspicion for an investigatory detention. Accordingly, the trial court erred in finding no reasonable, articulable suspicion to stop, and the State's first assignment of error is sustained.
 II.
We must next determine whether Clark voluntarily consented to the search of his suitcase. The State has the burden to prove consent was "freely and voluntarily given" based on the totality of the circumstances. Retherford, supra, at 596, citing Royer,460 U.S. at 497. The trial court found that Clark's consent was involuntary in part because he was unlawfully detained. However, we have already established that Clark was within the scope of a lawful detention. See Id.
Clark argued, and the trial court agreed, that his consent was also not voluntary because Detective Bollinger extended a "baseless threat" that he would obtain a search warrant. When an officer informs a suspect that he will obtain a search warrant if the individual does not consent to a search, this does not necessarily vitiate an otherwise voluntary consent. United States v. Salvo (1998), 133 F.3d 943, 954; State v.Clelland (1992), 83 Ohio App.3d 474, 481. If the officer's statement simply advises the suspect of his precise legal situation, such a "threat" is not coercion. State v. Berg (Oct. 4, 1996), Montgomery App. No. 15313, unreported, at p. 3. However, this requires the officer to be confident in his assessment that probable cause exists to issue a search warrant. Even if the officer has a good faith expectation that a warrant will issue, if he is wrong, he has thereby misinformed the suspect of a key fact that he relied on in giving his consent. For this reason, if an officer advises a suspect he will obtain a search warrant if consent is not given, probable cause must exist to obtain that warrant. Id.
Probable cause to obtain a search warrant exists when after reviewing all of the surrounding circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place."Illinois v. Gates (1983), 462 U.S. 213, 238. The Supreme Court found that innocent behavior frequently forms the basis of probable cause, depending on the degree of suspicion that attaches to the behavior.Sokolow, supra, at 10, citing Gates, supra, at 243-44, fn. 13. This is true because "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."Gates, supra, at 243-44, fn. 13. In the present case, Detective Bollinger had at least the eight previously-mentioned indicators that he could have presented on an affidavit to request a search warrant. Of particular importance was the final statement by Clark that he was not aware of the contents of his bag, considering the airlines are not supposed to accept luggage if the passenger says he did not pack it himself. This statement coupled with all of the previous drug profile characteristics demonstrates to this court that sufficient probable cause did exist to issue a search warrant.
Again, Clark and the trial court focused on the drug dog's failure to alert on the suitcase, arguing that this piece of evidence weighs against a finding of probable cause. However, as stated above, this court has previously upheld a finding of probable cause to issue a search warrant when a drug dog failed to alert. Wilkins, supra, at p. 7. In Wilkins, a magistrate issued a search warrant to search a package sent through the United States Postal Service based on an affidavit from the Postal Inspector. In his affidavit, the Postal Inspector stated that the parcel in question met several drug profile indicators, including: (1) false return address, (2) addressee not known to receive mail at the listed address, (3) package heavily taped, (4) mailed from a known drug source location, (5) misspellings on the label, (6) illegible waiver signature, and (7) delivery address located in known drug area. Id. at p. 6. Although the profile for a package is different than for an individual, the indicators in Wilkins are comparable in number and impact to the indicators in the present case. After reviewing all of the surrounding circumstances, we find that sufficient probable cause existed for a magistrate to issue a search warrant, had one been requested.
Further, there is no evidence of coercion by either of the detectives in this case. Only about fifteen minutes passed between the time the detectives brought Clark into the small classroom and the time the bag was actually searched. Clark was informed of his Miranda rights and waived them before he signed the consent to search form. Moreover, Detective Bollinger did not "threaten" to obtain a search warrant, he simply advised Clark that he could consent to the search, or they would obtain a search warrant. He advised Clark that it did not matter to him which route was taken. Based on all of the circumstances, we find that Clark's consent to search his suitcase was voluntarily given. Accordingly, the State's second assignment of error is also sustained.
Judgment reversed and remanded for trial.
WOLFF, J., and YOUNG, J., concur.