DECISION AND JUDGMENT ENTRY
Theresa L. Casey appeals her conviction for conveying contraband into a correctional facility, in violation of R.C. 2921.36(A)(2). Casey asserts that the trial court should have granted her motion to suppress. Because we find that Casey was not detained in violation of theFourth Amendment, we disagree. Accordingly, we affirm the judgment of the Ross County Court of Common Pleas.
 I.
The Ross County Grand Jury indicted Casey for knowingly conveying or attempting to convey on to the grounds of a Detention Facility a drug of abuse, a violation of R.C. 2921.36. Casey eventually moved to suppress all evidence found in the warrantless search of her person, vehicle and belongings, as well as any statements made on the day of her arrest. Casey argued that the searches of her person and vehicle were conducted without probable cause.
At the suppression hearing, the state presented the following version of the events of September 8, 2000.
Chillicothe Correctional Institution ("CCI") Investigator Paul Arledge testified that he monitored inmate phone calls to Casey's telephone number. From these phone calls, he concluded, based on his experience, that Casey was planning to smuggle drugs into CCI. Based on his conclusion, he "flagged" Casey, so that when she next came to visit an inmate at CCI, she would either be searched or monitored.
On September 8, 2000, Arledge called her into his office and asked her to submit to a voluntary strip search. This occurred after Casey had been processed into CCI as a visitor, as all visitors to CCI are. Arlege testified that once Casey was in his office, he questioned her about her purpose in coming to CCI and how she got to CCI. When she was processed in as a visitor, she indicated that she was visiting her brother; however, during her meeting with Arledge she admitted that the inmate she intended to visit was not her brother. Arledge testified that he told Casey that she could go regardless of whether she agreed to the search. However, he told her that if she did not agree to be searched, that she would not be permitted to visit the inmate at CCI and that her visitation privileges would be suspended. He also informed her that a Trooper wanted to talk with her when she left CCI and that the Ohio State Highway Patrol ("OSHP") may get a search warrant.
Arledge testified that Casey spent about an hour in CCI. He explained that during this hour: (1) Casey was processed like any other visitor; (2) he questioned her; and (3) once he obtained permission from a higher ranking officer to search Casey, the officers searched her. He estimated that the initial processing procedure took about twenty to thirty minutes of the hour Casey spent in CCI and that the actual search took about ten to fifteen minutes.
After two female corrections officers searched Casey, and found nothing, Casey left CCI.
According to OSHP Trooper Rebecca Leach, an institutional investigator informed her, prior to Arledge's interview with Casey, that there was a visitor by the name of Casey who was present at CCI that CCI personnel suspected of having previously brought illegal drugs into the prison. At that point she contacted the Chillicothe OSHP post and had the dispatcher determine whether Casey owned a vehicle. She found out that Casey had entered the prison with Toni Green, who was not permitted to enter the prison that day.
After receiving information from the OSHP dispatcher that Casey had two temporary vehicle tags in her name, Leach asked OSHP Trooper Mikesh to bring a drug dog to the prison to have the dog work the parking lot. Leach then went outside to the parking lot in an attempt to find a vehicle with one of the temporary tags. She found a white car with a female passenger. As Trooper Mikesh arrived at approximately 2:00 p.m., Casey had completed her visit and was leaving the prison. After instructing Trooper Mikesh on which vehicles to have the dog sniff, Leach approached Casey and asked her to "just hang tight for a second." According to Leach, Casey denied having a vehicle in the parking lot and in response to a question about how she was going to get home, Casey said that she was walking home to Dayton. Casey then walked away from the CCI parking lot, crossed State Route 104 and started hitchhiking southbound.
While Casey was attempting to hitchhike a ride, the drug dog alerted to Casey's vehicle. Trooper Mikesh went to speak with Casey while Leach conducted a search of the vehicle. In her search of Casey's vehicle, Leach found two tips of marijuana cigarettes ("roaches") and a baggy of marijuana in the vehicle. Leach did not interrogate or talk to Casey after the search.
Mikesh drove her patrol car southbound State Route 104 to where Casey was hitchhiking, approximately one-quarter mile south of CCI. Once Mikesh got out of her patrol car, Casey immediately asked Mikesh why she was checking her. Mikesh explained that she routinely checked pedestrians in the vicinity of CCI. Mikesh then asked Casey where she was going. Casey replied that she was walking home to Dayton. Casey's response struck Mikesh as odd because it was raining and Casey was wearing a dress. Mikesh then asked Casey why she would walk to Dayton when her car was in the CCI parking lot. Casey responded that she would come back later for it. Mikesh next informed Casey that a drug-sniffing dog had alerted to her vehicle. According to Mikesh, Casey admitted that there were some roaches in her ashtray.
Mikesh believed that she had not yet arrested Casey because she had not touched Casey and had never told her that she couldn't leave. Once Mikesh was informed that Leach had found drugs in the car, she read Casey a Miranda rights form and waited for another Trooper to pick Casey up.
After the state rested, Casey testified that on September 8, 2000 she arrived at CCI at approximately noon. After she was processed, she waited for about twenty or thirty minutes in the waiting room. An officer then asked her to "come here for a minute" and she stepped into the hallway. The officer informed Casey that an investigator wanted to see her.
The investigator accused her of smuggling drugs into CCI. Casey testified that he told her that if she didn't consent to being searched that she would stay in the office until an officer went downtown to get a warrant and that she couldn't leave until she was searched. Casey testified that she spent twenty or thirty minutes in his office and then asked if she agreed to the search if she would be able to visit the inmate. She also testified that she then waited thirty minutes for the investigator to get someone's signature on a paper before two female corrections officers searched her. Four officers then walked her back to the parking lot. Casey testified that Leach asked her what she was driving and told her to remain there. Casey testified that instead of remaining in the parking lot, she began walking south on State Route 104. When a trooper pulled up next to her at about 2:00 or 2:30 p.m. and asked her where she was going she told her she was going to Dayton. She denied ever admitting that the roaches or other drugs found in her vehicle were hers.
At the end of the hearing, the trial court verbally overruled Casey's motion.[1] As a result Casey indicated that she wanted to change her plea to no contest.
In August 2001, Casey pled no contest to the only charge in the indictment. The trial court found her guilty. After a pre-sentence investigation, the trial court sentenced Casey to five years of community control under the intensive supervision of the Ross County Probation Department. As part of her community control, the trial court ordered Casey to serve one hundred and eighty days in the Ross County Jail.
Casey timely appealed and asserts the following assignment of error:
 "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS."
 II.
In her only assignment of error, Casey argues that Trooper Leach did not have reasonable suspicion to continue her detention once the search of her person, to which she had consented, was over and she had left CCI. Implicit in her argument is that Trooper Leach detained Casey by preventing her from approaching her vehicle in the parking lot. Casey concludes that the trial court should have granted her motion to suppress.
We begin our discussion by noting that Casey has not challenged the propriety of the search that took place in CCI itself, but rather is challenging the propriety of Leach stopping her before she could return to her car and thereby prevent the search. Thus, our analysis is confined to two questions: (1) whether Trooper Leach detained Casey when she prevented her from going to her vehicle as she exited CCI; and (2) if so, whether Trooper Leach had reasonable suspicion to do so.
Appellate review of a decision on a motion to suppress evidence presents mixed questions of law and fact. United States v. Martinez
(C.A.11 1992), 949 F.2d 1117, 1119. At a suppression hearing, the trial court assumes the role of trier of fact, and as such, is in the best position to resolve questions of fact and evaluate witness credibility.State v. Carter (1995), 72 Ohio St.3d 545, 552. A reviewing court should not disturb the trial court's findings on the issue of credibility. Statev. Mills (1992), 62 Ohio St.3d 357, 366. A reviewing court must accept a trial court's factual findings if they are supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592, 594. An appellate court reviews the trial court's application of the law de novo.State v. Anderson (1995), 100 Ohio App.3d 688, 691.
The Fourth Amendment to the United States Constitution guarantees "the right of the People to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 14, ArticleI, of the Ohio Constitution guarantees the "right of all people to be secure in their person, houses, papers, and possessions, against unreasonable searches and seizures." Accordingly, the government is prohibited from subjecting individuals to unreasonable searches and seizures. Delaware v. Prouse (1979), 440 U.S. 648, 662; State v. Gullet
(1992), 78 Ohio App.3d 138, 143.
The investigative stop exception to the Fourth Amendment warrant requirement allows a police officer to conduct a brief investigative stop if the officer possesses a reasonable suspicion, based upon specific and reasonable facts, which, taken together with rational inferences from those facts, warrants the belief that criminal behavior is imminent.Terry v. Ohio (1968), 392 U.S. 1; United States v. Brignoni Ponce
(1978), 422 U.S. 873; State v. Andrews (1991), 57 Ohio St.3d 86; Statev. Venham (1994), 96 Ohio App.3d 649, 654. To justify an investigative stop, the officer must be able to articulate specific facts that would warrant a person of reasonable caution in the belief that the person stopped is about to commit a crime. Prouse at 659; Terry. The propriety of an investigative stop must be reviewed in the light of the totality of the circumstances. State v. Bobo (1988), 37 Ohio St.3d 177, 178. The scope and duration of the investigative stop must be limited to effectuate the purpose for which the initial stop was made. Venham,96 Ohio App.3d at 655 citing State v. Berry (Dec. 1, 1993), Washington App. No. 93CA17, unreported.
Not every encounter between a citizen and a law enforcement official implicates the state and federal prohibition on unreasonable searches and seizures. California v. Hodari D. (1991), 499 U.S. 621; State v. Taylor
(1995), 106 Ohio App.3d 741, 747. The United States Supreme Court has created three categories of police-citizen contact to identify the separate situations where constitutional guarantees are implicated: (1) consensual encounters, (2) investigative or "Terry" stops, and (3) arrests. See Florida v. Royer (1982), 460 U.S. 491, 501-507; UnitedStates v. Mendenhall (1980), 446 U.S. 544, 553; Lyndhurst v. Sadowski
(Sept. 2, 1999), Cuyahoga App. No. 74313, unreported.
Police may lawfully initiate a consensual encounter without probable cause or a reasonable, articulable suspicion of criminal activity.Mendenhall at 556. Encounters between the police and the public are consensual when the police approach an individual in a public place, engage the person in conversation, and request information, as long as the person is free to walk away. See Mendenhall at 554; State v. Jones
(1996), 112 Ohio App.3d 206. An officer's request to examine a person's identification or search his or her belongings does not render an encounter non-consensual; nor does the officer's neglect to inform the individual that he is free to walk away. See Florida v. Rodriguez
(1984), 469 U.S. 1; Florida v. Bostick (1991), 501 U.S. 429; Jones at 211-213.
A "seizure" of an individual giving rise to Fourth Amendment concerns occurs only when, in view of all the circumstances surrounding the incident, the police officer, either by physical force or by show of authority, restrains the person's liberty so that a reasonable person would not feel free to decline the officer's request and walk away. Statev. Williams (1990), 51 Ohio St.3d 58, 61; Jones at 211. This "reasonable person" test is based upon the state of mind of an innocent person, not a person engaged in criminal activity. Bostick at 438. Factors suggesting that a seizure has occurred include the presence of multiple police officers, the displaying of a weapon by the police, the use of language suggesting that compliance with police requests is compelled, and the physical touching of the person. Mendenhall at 554; Jones at 211.
Viewing the totality of the circumstances here, we find that a reasonable person in Casey's situation would have felt free to leave. Leach's request to Casey to "just hang tight for a second" while the drug dog sniffed the cars could have constituted an order restricting Casey's movements. However, Casey responded by immediately denying having a car and walking away. After a question by Leach about where she was going, Casey indicated that she was walking home to Dayton. Casey's response indicates that the tone of Leach's request implied an ability to walk away. While Leach's actions prevented Casey from driving away[2], they did not prevent her from walking away or otherwise leaving. Thus, we find that Leach did not detain Casey by asking her to "hang tight." Accordingly, we find that Leach did not detain Casey until after the drug dog alerted to her car, providing probable cause for the search that found the drugs that provided probable cause to support Casey's eventual arrest. Therefore we overrule Casey's only assignment of error and affirm the judgment of the trial court.
JUDGMENT AFFIRMED.
[1] The trial court did not file a written entry overruling the motion to suppress, however, we presume the court overruled it based upon the general presumption that a trial court's failure to rule on a motion means that it overruled the motion. State v. Rozell (June 20, 1996), Pickaway App. No. 95CA17, unreported.
[2] Neither side raised the issue of whether Leach impermissibly seized Casey's car by preventing her from approaching it while the drug dog was at work. However, we note that when a person abandons property that she owns or possesses, the act of abandonment operates to relinquish any reasonable expectation of privacy she had in the property that theFourth Amendment protects. Rawlings v. Kentucky (1980), 448 U.S. 98. Therefore, property that has been abandoned may be outside the prohibition against unreasonable searches and seizures that the Fourth Amendment imposes.Hester v. United States (1924), 265 U.S. 57; Abel v. United States
(1968), 362 U.S. 217. A person may abandon property for purposes of theFourth Amendment by denying ownership. See State v. Thomas (July 3, 1991), Montgomery App. No. 11861, citing State v. Johnson (1990),390 S.E.2d 707, 98 N.C. App. 290.