The STATE of Ohio, Appellee,

v.

TAYLOR, Appellant.

[Cite as *State v. Taylor* (1995), 106 Ohio App.3d 741.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. CA 14874.

Decided Oct. 11, 1995.

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, and *Arvin S. Miller,* Assistant Prosecuting Attorney, for appellee.

*David E. Kuns,* for appellant.

FREDERICK N. YOUNG, Judge.

Charles Edward Taylor appeals from the trial court's decision to overrule his motion to suppress cocaine found in his carry-on luggage. This case arises from an investigation at the Dayton International Airport, on July 13, 1994, of passengers on an incoming flight from Los Angeles. On that day, Detective Bollinger, a Dayton police officer, was working narcotics duty at the Dayton International Airport. Bollinger had five years' experience in this position and was specially trained in airport drug interdiction.

That morning, Detective Bollinger performed a routine check of the flight manifests looking for signs of possible drug trafficking. Detective Bollinger was

looking for individuals who met the drug courier profile. The drug courier profile is a list developed by federal agents that describes the characteristics generally associated with narcotics traffickers.

Some of the characteristics include (1) a particular manner of dress; (2) nervousness; (3) a particular form of payment for the purchases made; (4) how and when the purchases are made; (5) the purchase of a one-way ticket; and (6) the purchase of two tickets. *State v. Bryant* (May 30, 1991), Cuyahoga App. No. 58621, unreported, 1991 WL 95067. (The purchase of two tickets can be a sign of drug trafficking because the use of a decoy is commonly used to divert attention from the person carrying narcotics.) Another important consideration in the drug courier profile is the city the individual is flying in from. The Drug Enforcement Agency believes that most drugs enter the Midwest from four source cities: Los Angeles, New York, Miami, and San Diego. Therefore, drug enforcement agents pay particular attention to passengers who arrive from those cities.

In his review of the flight manifests, Detective Bollinger noticed a suspicious reservation on flight 611, a flight notorious for drug trafficking. The flight was incoming from Los Angeles, a major drug source city, to Cleveland, another major drug source city, with a transfer in Dayton. The single reservation was made for two passengers, Connors and Williams. The appellant, Charles Edward Taylor, was flying under the assumed name Connors.

The two individuals were originally supposed to fly from Los Angeles to Cleveland on the previous day, July 12, 1994. However, the manifest showed that the individuals did not make that flight. Instead, six minutes after that plane took off, those individuals made a second reservation for July 13, 1994. The reservation was for a one-way ticket with the individuals seated at either end of the plane, even though the plane was only half full and they could have been seated together.

Since many of these actions are characteristic of those carrying narcotics, Bollinger determined that he wanted to investigate these individuals further. Bollinger was working with Detectives Rockwell and Lubonovic that day. Rockwell and Lubonovic waited at the gate where the individuals were scheduled to transfer flights to Cleveland. After identifying Williams when he checked in for his flight, Lubonovic approached him to ask him a few questions.

Bollinger waited to investigate the other passenger, Taylor. Bollinger noticed that Taylor exited the plane much later than Williams, walked separately from him, and acted like he did not know him. Taylor checked into his flight and then intently watched from afar Williams being questioned by Detective Lubonovic. While Bollinger observed Taylor, he noticed that he was poorly dressed and had an unkempt appearance.

Bollinger testified that he approached Taylor in the passenger area from the side, so as not to block Taylor's path. Bollinger displayed his badge, identified himself as a Dayton police officer, and asked if he could speak to Taylor. Bollinger testified that he did this in a discreet manner and with a soft voice so as to lessen the intrusiveness of the encounter.

Taylor agreed to talk to him and Bollinger asked him if he could see his airline ticket. Taylor complied and then Bollinger asked him if he was flying alone or with someone. Taylor stated that he was flying alone. Bollinger asked Taylor if he was going to Cleveland for business or pleasure. Taylor replied that he was going to Cleveland to pick up a friend.

Then, Bollinger asked if Taylor had any form of identification with him. At this point, Taylor indicated that he was not Connors, the person named on the ticket. Bollinger then asked him why the ticket was in another person's name. Taylor answered that, originally, someone else was supposed to fly with him and that was why that ticket was bought.

Detective Bollinger testified that during this conversation Taylor was visibly shaking, he appeared extremely nervous, and his voice was breaking. When Bollinger asked to see Taylor's driver's license, he noticed that Taylor's hands were shaking as he handed the license to him. After looking at Taylor's license, Bollinger asked Taylor how he planned to return to Los Angeles. Taylor responded that he was going to purchase a ticket. To determine how he was going to pay for his ticket, Bollinger asked him how much money he was carrying with him. Taylor responded that he had $65.

At that point, Bollinger advised Taylor that he worked for the narcotics bureau and asked him if he was carrying any narcotics. When Taylor answered no, Bollinger asked if he could take a look in his carry-on bag. Taylor consented to the search of his bag. Upon opening the bag, Detective Bollinger found a block of cocaine and advised Taylor that he was under arrest for trafficking cocaine.

On July 19, 1994, Taylor was indicted on one count of aggravated trafficking in cocaine for possessing three times the bulk amount of cocaine, but less than one hundred times that amount. Taylor entered a plea of not guilty to the indicted charge on July 22, 1994. On August 10, 1994, Taylor filed a motion to suppress the cocaine found in his carry-on bag. On September 28, 1994, the trial court filed a decision and entry overruling Taylor's motion to suppress. Taylor subsequently entered a plea of no contest. On October 28, 1994, Taylor was found guilty and sentenced to an indefinite term of three to fifteen years' imprisonment, with three years being actual incarceration. Taylor filed a timely notice of appeal on November 8, 1994.

## I

In his sole assignment of error, Taylor asserts that:

"The trial court erred in overruling the defendant-appellant's motion to suppress evidence."

Taylor argues that he was seized when Bollinger asked to see his ticket and retained possession of it. At that point, Taylor maintains that Bollinger did not have enough reasonable suspicion to detain him. Consequently, he argues, his consent to search his bag was vitiated by the unlawful detention and the trial court erred in overruling his motion to suppress.

## II

Taylor's assignment of error presents two issues for this court to review. First, was Taylor seized within the meaning of the Fourth Amendment? Second, if Taylor was seized, was the seizure justified by a reasonable suspicion that he was engaged in criminal activity? The analysis of these issues is important because, if Taylor was seized, Taylor's consent to the search would not be valid unless Bollinger had reasonable suspicion that Taylor was engaged in criminal activity.

The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee "the right of people to be secure in their *persons,* houses, papers, and effects, *against unreasonable searches and seizures.*" (Emphasis added.) It is well established that these guarantees are not implicated in every situation where the police have contact with an individual. *California v. Hodari D.* (1991), 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690; *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. The United States Supreme Court has created three categories of police-citizen contact to identify the situations where these guarantees are implicated. *Florida v. Royer* (1982), 460 U.S. 491, 501–507, 103 S.Ct. 1319, 1326–1329, 75 L.Ed.2d 229, 238–243.

The first type is a consensual encounter. Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. *United States v. Mendenhall* (1980), 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497, 504–505. The request to examine one's identification does not make an encounter nonconsensual. *Florida v. Rodriguez* (1984), 469 U.S. 1, 4–6, 105 S.Ct. 308, 83 L.Ed.2d 165, 169–171; *Immigration & Naturalization Serv. v. Delgado* (1984), 466 U.S. 210, 221–222, 104 S.Ct. 1758, 1765–1766, 80 L.Ed.2d 247, 258–259. Nor does the request to search a person's belongings. *Florida v. Bostick* (1991), 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389. The Fourth Amendment guarantees are not implicated in such an encounter unless

the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. *Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509; *Terry v. Ohio* (1968), 392 U.S. 1, 16, 19, 88 S.Ct. 1868, 1877, 1878, 20 L.Ed.2d 889, 903, 904. Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the next two Supreme Court categories.

A pertinent example of a consensual encounter is found in the case *State v. McDaniel* (1993), 91 Ohio App.3d 189, 631 N.E.2d 1140. In that case a police officer was investigating the hallway of a building where it was suspected that drug activity was occurring. The police officer noticed McDaniel loitering in the hallway. He asked McDaniel a few questions and then asked him if he had any drugs on his person. When McDaniel stated that he did not, the police officer asked him if he could search him. McDaniel consented to the search, which produced a glass crack pipe with cocaine residue.

McDaniel claimed that he was unlawfully seized sometime during the encounter and that the evidence should have been suppressed because it was a fruit of an unlawful seizure. The court found the entire encounter consensual, stating, "It is well established that 'a seizure does not occur simply because a police officer approaches an individual and asks a few questions.' So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." (Citations omitted.) *Id.,* 91 Ohio App.3d at 191, 631 N.E.2d at 1141.

■ The second type of encounter is a *"Terry* stop" or an investigatory detention. The investigatory detention is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. The investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. *Terry, supra.* A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. *Mendenhall, supra,* 446 U.S. at 553, 100 S.Ct. at 1877, 64 L.Ed.2d at 508; *Terry, supra,* 392 U.S. at 16, 19, 88 S.Ct. at 1877, 1878, 20 L.Ed.2d at 903, 904.

■■ The Supreme Court in *Mendenhall* listed factors that might indicate a seizure. These factors include a threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking

the citizen's path. *Id.* at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509. A police officer may perform an investigatory detention without running afoul of the Fourth Amendment as long as the police officer has a reasonable, articulable suspicion of criminal activity. *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 906.

The third type of encounter involves a seizure that is the equivalent of an arrest. To perform such a seizure the police officer must have probable cause. *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324. A seizure is equivalent to an arrest when (1) there is an intent to arrest; (2) the seizure is made under real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested. *Id.* at syllabus.

These categories must be visited to determine whether an individual's consent to a search during an encounter is valid. For an individual's consent to be valid, the encounter must not have violated the Fourth Amendment. Since the Fourth Amendment guarantees are not implicated in consensual encounters, any voluntary responses given during consensual encounters may be used against the individual in a criminal prosecution. *Mendenhall, supra,* 446 U.S. at 559–560, 100 S.Ct. at 1880, 64 L.Ed.2d at 512–513; *Bostick, supra,* 501 U.S. at 439, 111 S.Ct. at 2388, 115 L.Ed.2d at 401–402. On the other hand, investigatory detentions do implicate the Fourth Amendment, and consent given during an investigatory detention is only valid if the police officer had reasonable suspicion to detain the person. *Royer, supra,* 460 U.S. at 502–503, 103 S.Ct. at 1326–1327, 75 L.Ed.2d at 239–240. Similarly, the Fourth Amendment guarantees are implicated during an arrest situation, and consent given during an arrest is valid only if the police officer had probable cause and the suspect was read his constitutional rights.

### III

In the present case, the focus of the discussion will be on consensual encounters and investigatory detentions. To reiterate Taylor's argument, he claims that he was subject to an investigatory detention in his encounter with Bollinger. Taylor's attorney supports this contention by claiming that since the record is not clear on whether Bollinger returned Taylor's airline ticket, it must be assumed that he did not. He argues that the holding of Taylor's ticket caused Taylor to feel that he was not free to leave and that Bollinger did not have reasonable suspicion to detain him. Therefore, his consent to the search was invalid.

We find no evidence in the record that Bollinger retained Taylor's ticket and we are unwilling to assume that he did or did not return it. Regardless, this

issue would not change the opinion we put forth today. Even if Bollinger did retain the ticket, the conversation was so short that we would be unwilling to say that retaining the ticket created a detention. If we did so, we would have to blunder through the absurd issues of whether, for example, forty seconds or one minute is too long to examine an airline ticket. We are unwilling to create such a bright-line rule.

We are also unpersuaded that the *Royer* case Taylor cites supports this claim. In *Royer, supra,* the police questioned an airline passenger who fit the drug courier profile. The police asked to see the passenger's ticket and driver's license and, without returning these items, asked the passenger to accompany them to the police room. The Supreme Court found that "[a]sking for and examining Royer's ticket and driver's license were *no doubt permissible in themselves,* but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment." (Emphasis added.) *Id.,* 460 U.S. at 501, 103 S.Ct. at 1326, 75 L.Ed.2d at 239.

Undoubtedly, that case does not hold that examining a ticket for a short period of time during an inquiry amounts to a detention. Nevertheless, we do not propose that retaining a person's means of travel never amounts to a detention; we find only that holding it for this short period of time, under these facts, did not create a detention.

■ Placing aside the issue of whether Taylor's ticket was retained, we can only find from the remaining undisputed facts that the entire encounter with Taylor was consensual. Therefore, we agree with the trial court that the encounter with Taylor did not offend the Fourth Amendment, but we reach this conclusion based on other grounds. In finding this a consensual encounter, we revisit our holding in a similar case, *State v. Lalezari* (Aug. 31, 1994), Montgomery App. No. CA 14177, unreported, 1994 WL 472172. Coincidentally, Detectives Bollinger and Lubonovic were the investigating officers in that case, also.

In *Lalezari,* Bollinger and Lubonovic decided that they wanted to investigate Lalezari the moment that they saw him exit his flight from Los Angeles, but at that time they had no grounds to stop him. The detectives investigated Lalezari and found that he had missed his connecting flight, his name was not listed on the manifest of the flight he arrived on, and he had a carry-on bag with him. At that point, the detectives approached him in a public place from the side, so as to not block his path, and asked to speak with him.

The detectives asked him where he was going, the purpose of his flight, and what business he was in. After receiving answers to these questions, the detectives asked Lalezari if they could see his ticket and Lalezari responded that they could not because he had already disposed of it. The detectives then examined his driver's license, told him that they were narcotics detectives, and asked him if he had any narcotics on him. At that point he looked at his suitcase and did not respond. The detectives also asked what name he flew in from Los Angeles under, and Lalezari responded that his mother made the reservations under her credit card, so the ticket was in her name. After reviewing the credit card, the detectives returned both his driver's license and credit card. Finally, the detectives asked if they could look in his bag and Lalezari said he did not mind. But before they actually looked in his bag, he told them that they were going to find narcotics.

Lalezari contended in his appeal to this court that he was unlawfully seized at some point before his suitcase was searched, thereby vitiating his consent to the search. This court held that there were no factors to indicate that Lalezari was at any point detained. This was the typical consensual encounter—the encounter occurred in a public place, Lalezari was merely asked a few questions, and information was requested. There was no evidence of a display of authority, no weapons were displayed, Lalezari was not physically touched, his path was not blocked, nor was there use of language or tone of voice indicating that compliance was compelled.

Furthermore, this court determined that the request to look in his suitcase did not strip the encounter of its consensual character. We reiterated the United States Supreme Court's holding that something more than a declaration that one is a narcotics agent, coupled with a citizen being the subject of serious criminal suspicion, is required to establish that a reasonable person in the citizen's position would believe that he is compelled to consent to a request to search. Judge Fain wrote the opinion for this court, recognizing that this binding precedent is somewhat difficult to accept. *Id.* He wrote:

"The frequency with which persons in Lalezari's position do, in fact, consent to a search of their possessions that is bound to disclose the existence of criminal contraband suggests to us that it may be a legal fiction to suppose that a reasonable person who has been identified as the subject of official suspicion of serious criminal activity would understand that he or she may refuse to consent to the search. Nevertheless, we are commanded to ignore this fact by the United States Supreme Court, which rejected a similar suggestion in *Florida v. Bostick, supra,* because 'the "reasonable person" test presupposes an innocent person.'" (Emphasis deleted.) *Lalezari, supra.*

In the present case, the uncontested facts indicate that Bollinger approached Taylor in plain clothes, alone, and in a public place. Furthermore, Bollinger approached Taylor from the side, so as to not block Taylor's path. Bollinger identified himself and asked if he could speak with Taylor. Bollinger did so in a discreet manner and with a soft voice. Bollinger asked Taylor a few questions and asked to see Taylor's airline ticket and driver's license. The contact with Taylor was very brief, lasting only a minute or less.

Based on this information, we find that this was a typical consensual encounter. Much like in *McDaniel* and *Lalezari*, the encounter occurred in a public place, Taylor was merely asked a few questions, and Bollinger requested some information from him. To turn this consensual encounter into a detention, there needed to be a display of physical force or authority that would have made a reasonable person in Taylor's position feel that he was not free to decline Bollinger's requests or otherwise terminate the encounter. The record is devoid of any such indication. There is no evidence that weapons were displayed, that Taylor was physically touched, that his path was blocked, nor was there use of language or tone of voice indicating that compliance was compelled. Even Bollinger's request to look in Taylor's bag, as pointed out by this court in *Lalezari*, with the mere declaration that he was a narcotics officer and Taylor's awareness that he was the subject of criminal suspicion, was not enough to turn this consensual encounter into a detention.

Since we find that Taylor was not detained, we do not need to address the second question of whether Bollinger had reasonable suspicion that he was engaged in criminal activity. However, we would like to note that we think that Bollinger could have detained Taylor. Almost immediately after entering into the conversation with Taylor, Bollinger had enough objective articulable facts to provide him with a reasonable suspicion.

Reasonable suspicion entails a minimal level of objective justification for making a stop. *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. It entails something more than an inchoate or unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *Id.* In making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. *United States v. Sokolow* (1989), 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1, 12. Within the first few moments of Bollinger's conversation with Taylor, he knew that Taylor exhibited behavior commensurate with the drug courier profile, he was poorly dressed, he acted as if he did not know Williams, he lied about traveling alone, he was visibly very nervous, and he was flying under an assumed name. These objective

articulable facts are clearly enough to establish a reasonable suspicion for a detention.

Finally, we find that Taylor's consent to search his bag was valid because it was voluntarily given during a consensual encounter. Any statements made during a consensual encounter may be used against the individual in a criminal prosecution. As the United States Supreme Court stated in *Florida v. Bostick, supra,* "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Id.,* 501 U.S. at 439, 111 S.Ct. at 2388, 115 L.Ed.2d at 401–402. Therefore, we affirm the trial court's ultimate decision to overrule Taylor's motion to suppress the evidence gained from his consent search.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Judgment affirmed.*

WOLFF and FAIN, JJ., concur.