OPINION
After a jury trial, Ramon Cantu was found guilty of two counts of drug abuse (one involving cocaine and the other involving marijuana). Cantu was sentenced to two years on the cocaine charge and six months on the marijuana charge, with the sentences to run concurrently. On appeal, Cantu claims that the trial court erred in overruling a motion to suppress evidence obtained as a result of an alleged illegal search of Cantu's automobile.
In rejecting Cantu's suppression motion, the trial court found that Cantu gave consent to search before he was detained, and that his consent was, therefore, voluntary. As a basis for appeal, Cantu contends that he was unlawfully detained by the police and that his consent was not voluntary under the totality of the circumstances. In particular, Cantu relies on the Ohio Supreme Court decision in State v. Robinette (1997), 80 Ohio St.3d 234, and our own decision in State v. Retherford (1994), 93 Ohio App.3d 586. The State's position is that Robinette and Retherford
do not apply because Cantu was not illegally detained.
Before addressing these points, we should mention that trial courts are in a better position than we are to evaluate evidence and the credibility of witnesses. State v. Mills (1992), 62 Ohio St.3d 357,366. As a result, in reviewing suppression decisions, we "accept the trial court's findings of fact if they are supported by competent credible evidence." Retherford,93 Ohio App.3d at 592. Then, "[a]ccepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." Id.
In this regard, the testimony at the suppression hearing disclosed the following pertinent facts. On April 24, 1998, Deputies Eric Hanes and Thomas Nichols of the Darke County Sheriff's Department were dispatched to St. Rt. 47 on a report that a vehicle was parked in the roadway. When they arrived at the scene, around 11 a.m., they found a Black Camaro parked partially on the road. The Camaro was a two-door, with a hatchback in the back. Per standard procedure, Hanes approached the car from the driver's side and Nichols went to the passenger side. As Hanes approached, he could not see inside because the windows were tinted. When he was able to see in, he saw a man (Cantu), sleeping in the driver's seat. Hanes knocked on the window, but Cantu did not respond. As a result, Hanes opened the car door.
At that point, Cantu sat up as if he had been startled. Hanes asked Cantu what was going on, and Cantu said he had lost his keys. However, Nichols could see the keys from his side of the car, and pointed out that the keys were in the ignition. Cantu then said he had run out of gas. Hanes checked the gas gauge and it did look like it was close to empty. At that point, Hanes asked Cantu to step out of the car so all three men could get out of the path of oncoming traffic.
After Cantu got out of the car, Hanes asked Cantu where he had been the night before. At that point, Cantu said he had been at a bar at St. Rt. 47 and Route 127. As they continued to talk, Hanes asked Cantu again where he had been the previous night. This time, Cantu gave a different answer, i.e., he said he had come from a bar in another town. At that point, Hanes asked Cantu if he would have a problem if the officers searched the car. Cantu said to go ahead, that it was fine with him. Nichols then searched the passenger compartment of the car while Cantu and Hanes stood by the cruiser, talking. At this time, Hanes told Cantu that for safety reasons, he would like to pat Cantu down to see if he had any weapons. Cantu agreed to a pat-down. Hanes did indicate in his testimony that Cantu had not done anything to cause him concern for his safety.
Hanes patted Cantu down and found a large bulge in his pocket. When Hanes asked about the bulge, Cantu pulled out a wad of $20 bills. Cantu's explanation for the money was that he was going to buy a car. Nichols then finished searching the inside of the passenger compartment. Although Nichols had not found anything, standard procedure was to search the entire vehicle. Hanes then asked Cantu if they could search the hatchback area. At this point, they had to get the keys from the ignition in order to open up the hatch. As soon as Nichols opened the hatch, he smelled a distinctive odor, which he believed was marijuana. At that time, Nichols gave Hanes a signal to handcuff Cantu because he had found something. Hanes handcuffed Cantu and placed him in the cruiser. Later, the box was found to contain both marijuana and cocaine.
Both Hanes and Nichols testified that they did not see any sign that Cantu was under the influence of alcohol. As a result, no intoxication tests were administered.
Some discrepancy in the testimony does exist. Nichols testified essentially to the same details as Hanes. However, in a narrative statement written on the day of the search, Nichols stated that Hanes searched Cantu before asking consent for the search of the car. In his testimony, Nichols explained this discrepancy by saying that the events in the narrative statement may not have been listed in the order in which they happened. Cantu also testified at the suppression hearing, and said he was already inside the police cruiser when the officers asked to search his car. Additionally, Cantu indicated that the money was found before the officers asked for consent to search the car.
According to Cantu, he had borrowed the Camaro from a friend about a week before because his wife's car had broken down. He was awakened by the officers and told them he ran out of gas because they kind of scared him. He did not think he had the right to refuse a pat-down search or a search of the car. No one told him he had a right to refuse and he did not think he was free to leave. He did admit that the officers were not rude and treated him in a fairly friendly manner.
In deciding that Cantu was not detained and that Cantu voluntarily consented to the search, the trial court obviously chose to believe the testimony of Deputy Hanes. The record contains competent, credible evidence to support the court's factual findings.
We have commented on many occasions that three types of citizen-police contact exist: 1) consensual encounters in which no restraint on liberty occurs; 2) "Terry stops," or detentions, which are limited in duration and purpose and are less intrusive than formal, custodial arrest; and 3) custodial arrests. See,e.g., State v. Taylor (1995), 106 Ohio App.3d 741, 747-48. Evidence found during consensual encounters may be used in subsequent criminal prosecutions because the Fourth Amendment only prohibits "unreasonable searches and seizures," not voluntary cooperation. Id. at 753.
In Robinette, the Ohio Supreme Court said that police officers may briefly detain individuals "without reasonably articulable facts giving rise to suspicion of criminal activity, if the detention promotes a legitimate public concern."80 Ohio St.3d at 241. Such a concern was present in this case, as the officers were called to the scene on a report that a car was parked in the roadway. The car's presence was certainly a hazard to passing motorists, and to any occupants of the car. Consequently, the officers were entitled to briefly detain and question Cantu.
During the original encounter with police, Cantu gave conflicting answers to a question about why his car was stopped. The officers then asked Cantu to step away from his car so that they could get out of the way of traffic. Again, this was appropriate and reasonable for the safety of all concerned. In response to further questioning, Cantu gave conflicting answers about where he had been the night before. According to Deputy Hanes, Cantu's account "wasn't matching up." It was at this point that Hanes asked if Cantu minded if the officers searched his car, and Cantu consented.
We find nothing in the record to indicate that Cantu was either unlawfully detained or coerced into giving his consent for the search. Specifically, the officers made no show of authority, did not have their weapons drawn, and by Cantu's own admission, were neither rude nor unfriendly. Cantu also was not physically touched in any way before giving the initial consent for the search. Taylor, 106 Ohio App.3d at 651. Consequently, we agree with the trial court that Cantu voluntarily consented to the search. We also believe that Cantu was not unlawfully detained at this time or during any other period of contact with the officers.
We do note that the evidence used to charge Cantu was found after Cantu was physically touched, i.e., patted-down. It was also discovered after the initial search of the passenger compartment disclosed nothing. At this point, Cantu consented to a search of the hatchback area (which was visible from the passenger area but could not be reached without opening the hatch). However, this detention was also lawful, as the officers had discovered reasonable, articulable facts giving rise to a suspicion of criminal activity.
In this regard, we commented in Taylor that "[r]easonable suspicion entails a minimal level of objective justification." Id.
at 752. We additionally said that in deciding if reasonable suspicion exists, "the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." Id.
Furthermore, the Ohio Supreme Court said in Robinette that if an officer finds out reasonably articulable facts giving rise to a suspicion of criminal activity during an initial detention, further detention and more in-depth investigation is allowed.80 Ohio St.3d at 234. Our own court has also stressed that "information gained during a valid encounter can establish reasonable suspicion for a detention." State v. Osborne (Dec. 13, 1995), Montgomery App. No. 15151, unreported, p. 10.
Under the circumstances of this case, we believe that the officers discovered reasonable, articulable facts giving rise to a suspicion of criminal activity after they arrived at the scene. As a preliminary matter, we note that it is highly unusual for motorists to be asleep in the middle of the day in cars parked partially on the roadway, especially busy state highways. Further, when Cantu was briefly questioned, he gave conflicting answers not once, but twice, to routine inquiries. The first contradictory answer might be attributed to the fact that Cantu had just been awakened and could, therefore, have been confused. However, no similar explanation exists for the discrepancy in Cantu's accounts of where he had been the previous evening. Moreover, after the pat-down, Cantu showed Hanes a large wad of cash, which would raise some suspicion in anyone's mind that criminal activity might be afoot. The presence of a large amount of cash also does not completely square with Cantu's claim that he ran out of gas. Unlike the matters relied on in Retherford to justify a search, the above factors are not consistent with "innocent travel." 93 Ohio App.3d at 601. Therefore, we conclude that Deputy Hanes had reasonable suspicion to detain Cantu for further investigation. Accordingly, the consent given after the pat-down was not the product of an unreasonable search and seizure.
Again, we focus on the fact that the officers did not have weapons drawn and did not act in a threatening or coercive manner. Deputy Hanes, who had the most contact with Cantu, was not rude and appears to have been engaging in normal conversation while waiting for Deputy Nichols to finish the search. Further, although the officers did not specifically tell Cantu that he was free to go, the fact is that they had not finished their investigation of the original problem. Specifically, they had not yet even checked Cantu's license, nor had even decided if they would issue a citation. And finally, while the officers did not tell Cantu that he could refuse consent, they were not legally required to do so. See, e.g., 80 Ohio St.3d at 241-42.
Based on the preceding discussion, we agree with the trial court that Ramon Cantu voluntarily consented to a search of his automobile. We also find that Cantu was not unlawfully detained. To the extent that a second "search" took place, it was lawful, as the officers had discovered reasonable, articulable facts giving rise to a suspicion of criminal activity. Accordingly, Cantu's single assignment of error is overruled and the judgment of the trial court is affirmed.
WOLFF, J., and YOUNG, J., concur.