OPINION *Page 2 
{¶ 1} Defendant-appellant Jonathan A. Buzzard appeals the August 7, 2007 Judgment Entry of the Licking County Court of Common Pleas denying his motion to suppress evidence. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On August 6, 2007, Patrolman Joe Owens of the Pataskala Police Department observed Appellant and a companion, Joe Beyer, wearing dark clothing, walking along a sidewalk. Officer Owens watched Appellant and Beyer enter a Jet Wash Laundromat in an area known to be a high crime, drug area. Officer Owens observed Appellant enter the bathroom of the laundromat and remain inside for approximately five minutes.
 {¶ 3} Officer Owens, accompanied by another officer, entered the laundromat. Inside the Laundromat, Beyer informed the officers he and Appellant were "waiting on Buzzard's mom to come pick them up." Officer Owens knocked on the bathroom door, at which time Appellant exited with bloodshot eyes and blood on his hands and forearm. Appellant was carrying a whole can of beer and a pack of cigarettes on his person.
 {¶ 4} Officer Owens asked Appellant to step outside so he could ask him a few questions. Officer Owens then placed his hand on the small of Appellant's back while indicating which direction to go. Outside of the laundromat, Appellant produced two syringes, one containing blood and a mixture of another substance, a black burnt spoon with a substance on the bottom, a plastic cellophane wrapper with a black substance in it, and a handgun. *Page 3 
 {¶ 5} Appellant was subsequently arrested and charged with possession of drug paraphernalia, having weapons under disability, carrying a concealed weapon, and possession of heroin. Appellant entered a plea of not guilty to the charges, and filed a motion to suppress the evidence. Following a hearing on the motion, the trial court overruled Appellant's motion to suppress, via Judgment Entry of August 7, 2007. Subsequently, Appellant withdrew his not guilty plea and entered a plea of no contest to the charges. The trial court sentenced Appellant to a term of incarceration.
 {¶ 6} Appellant now appeals, assigning as error:
 {¶ 7} "I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED DEFENDANT/APPELLANT'S MOTION TO SUPPRESS."
 {¶ 8} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. See State v. Fanning
(1982), 1 Ohio St.3d 19, 437 N.E.2d 583; State v. Klein (1991),73 Ohio App.3d 486, 597 N.E.2d 1141; State v. Guysinger (1993),86 Ohio App.3d 592, 621 N.E.2d 726. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See State v. Williams (1993),86 Ohio App.3d 37, 619 N.E.2d 1141, overruled on other grounds. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of *Page 4 
claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry (1994),95 Ohio App.3d 93, 641 N.E.2d 1172; State v. Claytor (1993),85 Ohio App.3d 623, 620 N.E.2d 906; Guysinger, supra.
 {¶ 9} Appellant maintains his encounter with Officer Owens was not consensual; therefore, the discovery of contraband on his person and his statements to Officer Owens should have been suppressed. Appellant argues the uniformed and armed officer's touching the small of his back while directing him where to go, constituted force such that a reasonable person would not feel free to decline his request or terminate the encounter. Specifically, Appellant asserts the encounter was no longer consensual but became custodial when Appellant was directed out of the Laundromat by Officer Owens.
 {¶ 10} Officer Owens testified at the suppression hearing:
 {¶ 11} "Q. Thank you. When you walked in — first of all tell me about this laundromat. Did you have any concerns, based on prior experience, with this laundromat or this area?
 {¶ 12} "A. Yes, I did. The laundromat itself is known for a lot of theft crimes and drug activity mostly.
 {¶ 13} "Q. Okay. So, you and Officer Thomas, I take it, then entered the building.
 {¶ 14} "A. Yes, we did.
 {¶ 15} "Q. Okay. And what did you do when you entered the building?
 {¶ 16} "A. I entered from the east side and Officer Thomas entered from the north side of the building. As soon as I walked in, the one individual that was wearing the *Page 5 
hooded sweatshirt walked over to the bathroom where the other subject was inside and was appearing to knock on the door and appearing that he was also trying to say something through the door. At that time I motioned him over to me so I could talk to him further.
 {¶ 17} "Q. Were you able to identify that person in the sweatshirt that was outside of the restroom?
 {¶ 18} "A. Yes. He stated his name was Joe Beyer.
 {¶ 19} "Q. And did you talk with him?
 {¶ 20} "A. I did. I asked what their — I asked him what they were doing there. He stated they were waiting on Buzzard's mom to come pick them up.
 {¶ 21} "Q. Did you ask him about the person in the restroom?
 {¶ 22} "A. I did. I asked him who was in the restroom. He stated "Buzzard" and mumbled the name of Keith after that.
 {¶ 23} "Q. So the person in the dark hooded sweatshirt was Mr. Beyer.
 {¶ 24} "A. Yes, ma'am.
 {¶ 25} "Q. Did you see Mr. Beyer go into the restroom at any time during your observation of the two individuals?
 {¶ 26} "A. No, I did not.
 {¶ 27} "Q. Okay. Did you attempt to talk with the person in the restroom?
 {¶ 28} "A. I did. After talking a little while with Joe Beyer, Officer Thomas stayed with Joe while I walked over to the restroom. I knocked several times on the door and Mr. Buzzard eventually came out.
 {¶ 29} "Q. Okay. When he came out, what did you notice about him? *Page 6 
 {¶ 30} "A. I noticed immediately he had bloodshot, glassy eyes. His hands appeared to have blood on them.
 {¶ 31} "Q. Tell me about what his — was it just his hands that had blood on them?
 {¶ 32} "A. His hands and a little bit on his right arm.
 {¶ 33} "Q. What was the appearance of his shirt that would allow you to see this?
 {¶ 34} "A. He was wearing a hooded sweatshirt as well. His sleeves were pulled or pushed up his arm, just above his elbow.
 {¶ 35} "Q. And describe what the blood on his arms and hands, what did it appear — how did it appear?
 {¶ 36} "A. Trace amounts throughout his hands and trace amounts down his forearm.
 {¶ 37} "Q. Did it seem to trail, is that what you're telling me?
 {¶ 38} "A. Yes, ma'am.
 {¶ 39} "Q. Okay. Once he left the bathroom and you observed him, did you observe anything else about his clothing at that time?
 {¶ 40} "A. I did. He had a front pocket on his sweatshirt and it appeared to be bulging with some items in there. I asked him if he had anything in there and he pulled out a whole can of beer and a pack of cigarettes.
 {¶ 41} "Q. Was he able to explain the blood on his arms?
 {¶ 42} "A. He said he just came from Taco Bell and it was hot sauce on his arm.
 {¶ 43} "Q. Do you know what hot sauce looks like?
 {¶ 44} "A. Yes. *Page 7 
 {¶ 45} "Q. Did it appear to be hot sauce to you?
 {¶ 46} "A. No, it did not.
 {¶ 47} "Q. Do you know what blood looks like?
 {¶ 48} "A. Yes.
 {¶ 49} "Q. Have you seen blood before?
 {¶ 50} "A. Yes.
 {¶ 51} "Q. Did the substance on his arms appear to be blood to you?
 {¶ 52} "A. Yes, it did.
 {¶ 53} "Q. So, after you had this conversation at the — where did that occur, inside the laundromat?
 {¶ 54} "A. This was inside the laundromat and outside the restroom.
 {¶ 55} "Q. Right outside the restroom. Did you take your conversation anywhere else?
 {¶ 56} "A. I did. After that — after this point, I asked him to walk with me outside and I was going to question him further out there.
 {¶ 57} "Q. Okay. And did Mr. Buzzard walk with you outside?
 {¶ 58} "A. Yes, he did.
 {¶ 59} "Q. How did you get him to go outside? Explain to me how that happened.
 {¶ 60} "A. I directed to his left side. I believe I may have put my hand on the small of his back just to show him the direction I wanted him to go toward the east door.
 {¶ 61} "Q. Did you keep your hand on his back?
 {¶ 62} "A. No, I did not. Once I had showed him the direction I wanted him to go, I walked with him. I opened the door for him. He walked outside. *Page 8 
 {¶ 63} "* * *
 {¶ 64} "Q. What happened once you got outside?
 {¶ 65} "A. I asked him if he had anything else on him that I should — that I should know about. At that time he pulled out two syringes and one of the syringes appeared to have blood and a mixture of some other substance in there.
 {¶ 66} "Q. What did that other substance look like?
 {¶ 67} "A. It was a darkish brown color. Along with that there was also a spoon that he had also.
 {¶ 68} "Q. Did he make any statements to you about the syringes?
 {¶ 69} "A. Yes, he did. He said he used the syringe to shoot heroine.
 {¶ 70} "Q. And I think I might have cut you off. You said a spoon, correct?
 {¶ 71} "A. Yes.
 {¶ 72} "Q. And what was — what was unusual about the spoon?
 {¶ 73} "A. It appeared to have a black burnt substance on the bottom curve part of the spoon.
 {¶ 74} "Q. After he handed you the syringes and the spoons and told you that he used those — let's back up just a moment. You said there were — there was blood and another substance in one of these syringes, correct?
 {¶ 75} "A. Yes.
 {¶ 76} "Q. What did that other substance look like?
 {¶ 77} "A. It was a darkish brown color along with what appeared to be a mixture of blood inside the syringe.
 {¶ 78} "Q. Have you had training in field identification of suspected narcotics? *Page 9 
 {¶ 79} "A. Yes, I have.
 {¶ 80} "Q. And what did you believe, based upon your training, to be in the syringe?
 {¶ 81} "A. Definitely a drug substance; however, I was unsure of what it could have been.
 {¶ 82} "Q. Once he made this statement and provided you with these items, what did you do?
 {¶ 83} "A. At that time I placed his hands on the outside of the building of the laundromat and I conducted a pat down. While I was patting down in his waist area, I did pull out a plastic cellophane wrapper with a black substance in it. I continued to pat him down further down his right leg. I felt the top of his right leg and a handgun fell out of his pant legs.
 {¶ 84} "Q. At the time that you asked him to place his hands against the wall and you began your pat down search, what was your intention?
 {¶ 85} "A. At that time he was to be placed under arrest for the drug paraphernalia."
 {¶ 86} Tr. at 11-18.
 {¶ 87} In Terry v. Ohio (1968), 392 U.S. 1, 22, 88 S.Ct. 1868, the United States Supreme Court determined "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." However, for the propriety of a brief investigatory stop pursuant to Terry, the police officer involved "must be able to point to specific and articulable facts which, taken together with rational *Page 10 
inferences from those facts, reasonably warrant that intrusion." Id. at 21. Such an investigatory stop "must be viewed in the light of the totality of the surrounding circumstances" presented to the police officer. State v. Freeman (1980), 64 Ohio St.2d 291, 414 N.E.2d 1044, paragraph one of the syllabus.
 {¶ 88} However, a stop does not have to meet the Terry test if it involves a consensual encounter. A consensual police encounter versus aTerry stop is explained in State v. Taylor (1995), 106 Ohio App.3d 741,667 N.E.2d 60, as follows:
 {¶ 89} "Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. * * * The request to examine one's identification does not make an encounter nonconsensual. * * * Nor does the request to search a person's belongings. * * * The Fourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. * * * Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the next two Supreme Court categories.
 {¶ 90} "* * * a Terry stop or an investigatory detention. * * * is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. The investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions.* * *A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he *Page 11 
was not free to leave or is compelled to respond to questions." Id. at 747-748, 667 N.E.2d 60. (Citations omitted)."
 {¶ 91} In the instant action, we find Officer Owens' act of placing his hand on the small of Appellant's back to indicate a direction to walk, does not demonstrate physical force or a show of authority significant enough to restrain Appellant of his liberty so that a reasonable person would not feel free to decline the request or terminate the encounter. The Officer's mere gesture did not change the nature of the encounter from consensual to custodial.
 {¶ 92} Accordingly, Appellant's sole assignment of error is overruled, and the August 7, 2007 Judgment Entry of the Licking County Court of Common Pleas is affirmed.
 Hoffman, P.J., Gwin, J. and Wise, J. concur *Page 12 
 JUDGMENT ENTRY
For the reason stated in our accompanying Memorandum-Opinion, the August 7, 2007 Judgment Entry of the Licking County Court of Common Pleas is affirmed. Costs assessed to Appellant. *Page 1