[Cite as *State v. Allen*, 2012-Ohio-3709.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                      :

      Plaintiff-Appellee                    :        C.A. CASE NO.    24587

v.                                                 :        T.C. NO.    10CR3705

GREGORY ALLEN                                      :        (Criminal appeal from
                                                             Common Pleas Court)

      Defendant-Appellant                   :

                                                   :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the   17th   day of    August   , 2012.

· · · · · · · · · ·

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

PAMELA L. PINCHOT, Atty. Reg. No. 0071648, Clyo Professional Center, 7960 Clyo Road, Dayton, Ohio 45459
      Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Gregory Allen, filed

April 13, 2011.  Allen appeals from his Judgment Entry of Conviction, dated January 31, 2011, following a plea of no contest to one count of possession of crack cocaine, in an amount which equaled or exceeded one gram but was less than five grams, in violation R.C. 2925.11(A).  Allen was sentenced to community control for a period not to exceed five years.  We hereby affirm the judgment of the trial court.

{¶ 2}    Allen's arguments on appeal relate to the trial court's denial of his motion to suppress, which was filed on February 15, 2011.  At the suppression hearing, Dayton police officer Jason Berger testified that he has three years of experience with the department, and that on November 13, 2010, at approximately 1:53 a.m., he and his partner, Andrew Clark, were on routine patrol in a marked cruiser, when Berger observed Allen "crouched down behind a pillar in front of a closed business."   Berger stated that Allen was on Main Street, directly across the street from an RTA hub.  Berger stated that he often works overtime assignments in the area, "to cut down on fights as well as there's a lot of drug trafficking that goes on there.  A lot of problems with juveniles."  Berger stated that he has made drug arrests in the area.  According to Berger, Allen was "kneeling down," and Berger "could see him doing something with his hands."  Berger stated that he was unable to determine what Allen was doing because it was "very dark."  The officer stated that he was concerned that Allen may have been trying to break into a business, or perhaps had "stumbled out of a bar" and was intoxicated.

{¶ 3}       Berger testified that he drove his cruiser onto the sidewalk and got out of the vehicle to initiate contact with Allen.  According to Berger, Allen got up and began to walk away toward Third Street, and Berger then introduced himself as a Dayton police officer and asked Allen why he had been crouching behind the pillar.  At that time, Allen "started diving for

his right pocket." Berger stated that he instructed him, "don't grab for your pocket," out of concern that he might be reaching for a weapon. Berger testified that Allen continued "grabbing for his right pocket," and Berger then grabbed Allen's arm and walked him to his cruiser, placing his hands on the hood. Berger stated that Allen again reached for his right pocket, and Berger advised Clark to go "ahead and get your taser out."

{¶ 4} Berger testified that Allen then cooperated with him, and he "began to conduct a *Terry* pat down of his outer clothing" for weapons. Berger stated that he retrieved marijuana and crack cocaine from Allen's right pants pocket. When he initially felt the items, Berger stated that he felt a plastic baggie containing marijuana, and that the marijuana was "kind of soft to the touch." Berger testified, "I've encountered it a lot of times. I know * * * what it feels like." Berger testified, "[y]ou can actually even hear the baggie as your hand's going over the top of it." Regarding the crack cocaine, Berger testified, "I didn't know it was crack at first. And not until I went in to pull the marijuana out is where that came out with it. I felt it at that point; I didn't know what it was." Berger stated that the crack cocaine was in a separate baggie, and that during the pat down he could not tell whether Allen's pocket contained one or two baggies. Once the baggies had been retrieved, Berger stated that he immediately placed Allen in handcuffs, and after completing the pat down, placed him in his cruiser. Berger testified that he considered Allen to be under arrest for possession of crack cocaine. He stated that he tested the crack cocaine at the police department.

{¶ 5} Berger stated that Allen did not make any statements during the pat down. According to Berger, he did not ask Allen any further questions until after he Mirandized him in the rear of his cruiser, using a rights card from the prosecutor's office. Berger stated that he

advised Allen that he had the right to an attorney, and that Allen did not request one. He further advised Allen that he had a right to remain silent. Berger stated that he advised Allen that anything he said could be used against him in court. Berger testified that Allen appeared to understand his rights and did not ask any questions. Berger stated that he asked Allen if he was willing to waive his rights and speak to him, and that Allen was willing to do so. Berger stated that he questioned Allen for about 10 minutes, during which time neither he nor Clark threatened him or made any promises in exchange for his answers. Berger stated that Allen never indicated that he did not want to talk to him, and he did not request an attorney. Berger eventually transported Allen to the Montgomery County Jail.

{¶ 6} On cross-examination, Berger testified that he had training at the academy regarding the detection of drugs in the course of a pat down, and that since then he estimated that he has conducted at least one pat down in the course of every shift for the past three years. Berger stated that drugs were recovered in "a third at the very most" of those pat downs, and that the purpose of the pat downs is to detect weapons and not drugs. Berger testified that his attention was drawn to Allen due to "the dim litted (sic) area; the closed business. And the fact that he's * * * crouched down in front of this closed business and doing something with his hands." Berger further noted his "experience with the RTA bus hub, which is directly across the street, and drug activity." He stated that in the past year he did not recall responding to the area due to break-ins. The following exchange occurred:

Q. Would you agree with me that he wasn't committing a crime though[?]

A. Right. He was not committing a crime.

A. * * * You've also indicated - - I don't know if you recall this, but in your

report you indicated that that area has been an area where there's been a lot of break-ins; correct?

A. Yes.

Q. * * * But you've just indicated in your testimony that in the past year you haven't been called out - -

A. Right.

Q. - - for any break-ins, correct?

A. We get emails all the time with the hot spots of break-ins and - - and almost on a daily basis. It come out to * * * our in-work e-mail system with locations that have been broken into, items that have been stolen and things of that nature.

Q. But in the past year, you haven't been called out in that area; correct?

A. I have not personally been called out for a break-in, no.

{¶ 7} Berger stated that he approached Allen for investigative purposes, and to check on his well-being. When asked why he patted Allen down, Berger testified: "Individuals usually grabbing for their pockets are trying to hide something and/or they're trying to get - - to get rid of something. And I've had lots of interactions, at least in the Fifth District, where individuals do have a gun on them; they do pull it out; they do throw it on the ground; they do take off running." When asked why he believed the baggie he felt in Allen's pocket contained marijuana, Berger stated that in addition to its feel, he could smell marijuana on Allen's person.

{¶ 8} Allen testified that at the time of his arrest he was "coming up Main Street going towards Third Street." Allen stated that he had been at the home of a cousin, Sholanda, and that

he was carrying a bowl of spaghetti, which he was eating, and "a pop in a plastic bag with my CDs in it," when the officers approached him. Allen stated that he did not recall Berger telling him to stop, and that he reached into his pocket to retrieve his identification.

{¶ 9} On cross-examination, Allen stated that he was not crouched down at the time but was walking along, eating his spaghetti with a fork. Allen stated that the area was illuminated by the street lights on Main Street. Allen stated that he had "the bag in one hand with the bowl and the fork in my other hand." Specifically, Allen testified that his fork was in his left hand and the bowl was in his right hand. According to his testimony, when Allen heard the officers pull onto the curb, he put his fork into the bowl and reached into his back right pocket for his identification. When asked if he reached into his right rear pocket with his left hand, he replied, "* * * the type of pants that I got on, they baggie pants, so the pockets are not that hard for you to reach in to get 'em." Allen stated that he reached for his identification before Berger spoke to him, and that when Berger approached, he put his bowl on the ground.

{¶ 10} The trial court issued an oral decision overruling Allen's motion on March 9, 2011. The court initially noted that it found Berger's testimony "to be credible and believable," and in contrast "did not find Mr. Allen's to be credible." The court incorporated Berger's testimony "into this decision as the court's factual conclusions." The court identified four issues for resolution, namely: (1) "the constitutional propriety of the encounter between" the officers and Allen; (2) whether the pat-down search of Allen was constitutionally appropriate; (3) "whether under the plain feel doctrine, Officer Berger had the right to retrieve that which turned out to be crack cocaine" from Allen's pants pocket; and (4) whether Allen's statements "after he was arrested and received his Miranda warnings are subject to suppression."

{¶ 11}  Regarding the initial encounter between Berger, Clark and Allen, the court determined that it was in the nature of an investigative detention, or "*Terry* stop."  The court determined that "kneeling behind a pillar in front of a closed business at 1:55 a.m. constitutes a reasonable and articulable suspicion that Mr. Allen * * * was engaging in or about to engage in criminal activity."  The court accordingly found that "the initial encounter was an appropriate *Terry* stop and was constitutionally appropriate and permissible."

{¶ 12}  Regarding the pat-down search, the court determined that it was "constitutionally appropriate" for Berger to conduct the pat down.  Of significance to the trial court was Allen's "continued insistence to reach into his right pant pocket, even after being told not to do so on repeated occasions," such that Berger had "a sufficient specific articulable suspicion that Mr. Allen was armed."

{¶ 13}  Regarding the retrieval of the contraband from Allen's pocket, the trial court determined that "Berger's testimony that he immediately recognized that which he felt during the pat-down search as a probable baggie of marijuana provided the needed probable cause to retrieve the baggie."  The court noted that the retrieval of the marijuana led to the discovery of the crack cocaine, and it concluded that there was "no basis upon which to suppress the crack cocaine based upon any violation of the plain feel doctrine."

{¶ 14}  Finally, regarding any statements made by Allen, the court found that Berger Mirandized Allen upon arrest, and that Allen made a knowing and voluntary waiver of his rights. The court noted, "there is nothing in the record to suggest that Mr. Allen, by virtue of intoxication or any mental defect or disease, lacked the mental capacity to waive his Miranda rights."  The court further noted, "there is nothing in the record to suggest that Mr. Allen's will was overcome

by violence, threats, trickery or false promises."

{¶ 15} Allen asserts one assigned error as follows:

THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS AS THE DAYTON POLICE OFFICER DID NOT HAVE REASONABLE, ARTICULABLE SUSPICION TO BELIEVE DEFENDANT-APPELLANT WAS ENGAGED IN CRIMINAL ACTIVITY AT THE TIME OF THE STOP AND, THEREFORE, HE VIOLATED THE RIGHTS GUARANTEED TO THE DEFENDANT-APPELLANT BY THE FOURTH AMENDMENT TO THE UNTIED STATES CONSTITUTION AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION.

According to Allen, the officers "relied on an inchoate hunch or suspicion and did not have a reasonable, articulable cause to believe" that Allen was involved in criminal activity. Allen further asserts that crouching behind a pillar is "essentially neutral or ambiguous," and that there was not a "nexus" between his conduct and specific criminal activity.

{¶ 16} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an

appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990. *State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 17} The Fourth Amendment to the Untied States Constitution, which is applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons and things to be seized." Violations of the Fourth Amendment require courts to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 18} As this Court has previously noted:

"The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Not all interactions between citizens and the police, however, constitute a seizure. Rather, the interactions between citizens and law enforcement officers can fall within three distinct categories: a consensual encounter, an investigative detention, and an arrest. *State v. Taylor* (1995), 106

Ohio App.3d 741, 747-749, 667 N.E.2d 60."

* * *

"An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. * * * Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. * * * . 'Reasonable suspicion entails some minimal level of objective justification for making a stop - that is, something more than an inchoate hunch and unparticularized suspicion or "hunch" but less than the level of suspicion required for probable cause.' *State v. Jones* (1990), 70 Ohio App.3d 554, 556-557, 591 N.E.2d 810. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances '"through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold."' *State v. Heard*, Montgomery App. No. 19323, 2003-Ohio-1047, at ¶ 14, quoting *State v. Andrews* (1991), 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271. * * * *State v. Curtis*, 193 Ohio App.3d 121, 2011-Ohio-1277, 951 N.E.2d 131 (2d Dist.).

{¶ 19} "'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may simply be

the essence of good police work to adopt an intermediate response. * * *.'" *State v. Freeman*, 64 Ohio St.2d 291, 295-96, 414 N.E.2d 1044 (1980). Further, a "'brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the time.' * * * ." *Id*., 296.

{¶ 20} Presence in a high crime area, standing alone, is insufficient to justify an investigative detention. As this Court has previously determined:

> The facts and circumstances before the officer must yet reasonably suggest that some specific criminal activity is afoot. That specificity requirement focuses on the criminal character of the act, not on its setting. Acts that are essentially neutral or ambiguous do not become specifically criminal in character because they occur in a high crime area. Acts that are not specifically criminal in character do not become criminal because they are inapposite to their setting and, therefore, "suspicious." The setting can inform the officer's judgment, but it does not make the act criminal. In order to detain an individual to investigate for crime, some nexus between the individual and specific criminal conduct must reasonably exist and must be articulated by the officer. *State v. Maldonado*, 2d Dist. Montgomery No. 13530, 1993 WL 402772 (Sept. 24, 1993).

{¶ 21} Allen directs our attention to *State v. Maldonado*, in which this Court vacated Maldonado's conviction and remanded the matter for further proceedings, having concluded that the trial court erred in overruling his motion to suppress. Maldonado had been detained in a high crime area by officers assigned to "preventative patrol," and this Court considered the presence of

law enforcement in the area for such a purpose as follows:

Certainly, that is a proper and legitimate way to discourage crime and diminish criminal activity. It will, naturally enough, be employed where the incidence of crime is greater. Those facts do not, however, give officers so assigned any greater authority to detain or search persons found in their assignment area. While the greater incidence of crime in an area is likely to make searches performed there more productive of arrests, that corresponding probability permits no greater governmental intrusion than the Fourth Amendment allows elsewhere. In all instances, absent a warrant the facts before the officer must reasonably suggest that some specific criminal misconduct is afoot. Otherwise, law enforcement officers may not invade the right to personal security and privacy that the Fourth Amendment was designed to protect.

{¶ 22} Allen further asserts that the matter herein is analogous to *State v. Belcher*, 2d Dist. Montgomery No. 14385, 2011-Ohio-5015. Therein, a police officer on his way to work, at 5:20 a.m., observed three men, whom he did not recognize, walking in the grass in an area not known for pedestrian traffic and where "there had been significant recent criminal activity in the area, including thefts from vehicles, garages, and residential burglaries." *Id*, ¶ 10. The officer proceeded to the station and returned to the area in a marked cruiser. When he approached the men, he noted that one of them carried a backpack. This Court determined as follows:

The conduct observed by Officer Titus * * * fails to demonstrate a nexus between the men and some particular criminal conduct such as theft. No matter how unusual someone wearing a backpack and walking along Old Salem Road at

5:20 a.m. may be, that conduct itself is innocent or at most ambiguous, and not indicative of any criminal activity.

Furthermore, the mere fact that this innocent or ambiguous conduct occurred in an area where crimes had occurred does not make it criminal in character or give rise to a reasonable articulable suspicion of specific criminal activity. [citing *Maldonado*]. Simply being present in a high crime area, by itself, is not indicative of criminal activity, nor does it justify a *Terry* investigative stop. * * * Officer Titus detained Defendant on nothing more than an inchoate hunch, which is legally insufficient to justify a *Terry* investigative stop. * * * The *Terry* investigative stop and detention/seizure of Defendant's person in this case [were] therefore illegal and violated Defendant's Fourth Amendment rights. *Id.,* ¶ 30-31.

{¶ 23} Having thoroughly reviewed the record before us, relying upon the trial court's assessment of Berger's and Allen's credibility, and accepting the facts as found by the trial court, we conclude that a reasonable, articulable suspicion justified the investigative detention of Allen, and that *Belcher* is distinguishable from the matter herein. Allen was crouched down, behind a pillar, in front of a closed business. The area was dimly lit, and Allen was doing something with his hands which Berger could not ascertain due to darkness. Berger testified that Allen's location was across the street from the RTA hub, where Berger often works overtime "to cut down on fights as well as there's a lot of drug trafficking that goes on there. A lot of problems with juveniles." Berger has made drug arrests in the area. When Berger attempted to speak to Allen, Allen turned to walk away and repeatedly grabbed at his pocket after being instructed not to do so. Berger was not physically seized until after ignoring Berger's orders. Also, although he

personally had not responded to a break-in the area in the past year, Berger indicated in his report that the area was one where break-ins often occurred.

**{¶ 24}** In contrast to *Belcher*, we conclude that the requisite nexus between Allen's conduct and criminal activity is present. While the conduct of the suspects in *Belcher,* merely walking in a high crime area, was innocent or at most unclear, Allen was crouching behind a pillar and doing something unknown with his hands, in front of a closed business. In other words, Allen's conduct gave rise to a reasonable suspicion of criminal activity, and the trial court properly overruled Allen's motion to suppress.

**{¶ 25}** Allen's sole assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Michele D. Phipps
Pamela L. Pinchot
Hon. Michael L. Tucker