[Cite as *State v. Vargas*, 2025-Ohio-4482.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-1 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 CR 0601 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| FERNANDO J. VARGAS | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on September 26, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

**OPINION**
GREENE C.A. No. 2025-CA-1

ADRIAN KING, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Defendant-Appellant Fernando Vargas appeals from his conviction for aggravated possession of drugs. According to Vargas, the trial court's evaluation of whether a police officer's cruiser impeded his path of travel on foot, purportedly resulting in his detention, was clearly erroneous, and the court should have granted his motion to suppress evidence.

{¶ 2} Based on the record before the trial court, Vargas's initial encounter with a police officer was consensual. The officer saw drugs in plain view, which provided probable cause for Vargas's seizure and arrest. The trial court did not err in overruling the motion to suppress. Therefore, the judgment of the trial court is affirmed.

I. Facts and Course of Proceedings

{¶ 3} On November 13, 2023, Vargas was indicted with one count of aggravated possession of drugs (methamphetamine), a second-degree felony, with a specification for forfeiture of the drugs and contraband. Vargas filed a motion to suppress evidence. The trial court held a hearing on the motion and received testimony from one witness, Detective Connor Mulcahy.

{¶ 4} At the time of the hearing, Mulcahy had been employed as police officer for a little more than six years; all his employment, other than one month, had been with the city of Fairborn. Mulcahy's normal duties at the time of the alleged crime were to patrol roads, investigate traffic and criminal offenses, respond to calls, and protect neighborhoods.

Mulcahy had conducted approximately one hundred drug investigations during his employment. Based on Mulcahy's training and experience, he was familiar with how illegal drugs are packaged and concealed.

{¶ 5} On June 19, 2023, Mulcahy was on duty, working the day shift as a patrol officer. He was in a marked police cruiser, wearing his uniform. He was equipped with a functional cruiser camera and body camera. The cameras recorded Mulcahy's interaction with Vargas. The trial court received copies of the cruiser and body camera recordings, a photo of Vargas at the scene, and Vargas's bag of illegal drugs as the State's exhibits. During the patrol, Mulcahy saw Vargas, whom Mulcahy knew from prior on-duty interactions. Mulcahy had previously received information from community members suggesting that Vargas was selling drugs. A neighbor had flagged Mulcahy down, and the police had pictures and videos of Vargas allegedly selling drugs. Mulcahy was aware that most of the people Vargas associated with, such as friends and a girlfriend, had been arrested due to drug usage or were known to be around drugs. Mulcahy also had previously arrested people on Vargas's front porch for warrants when Vargas was inside the home.

{¶ 6} Around 2:00 to 3:00 p.m. that day, Mulcahy noticed Vargas walking in the Wright View neighborhood. The neighborhood had higher police activity than most other places in Fairborn, with reported crime including weapon complaints, thefts, domestic crimes, and many drug complaints. When Mulcahy saw Vargas, he had intended to "check in" with Vargas because he knew Vargas's partner had recently given birth, and he wanted to see how Vargas was doing. Vargas had not committed any crimes while he was walking. Mulcahy turned around but saw that Vargas was gone. However, Mulcahy saw a car leaving from the area where he had seen Vargas and began following it. Mulcahy wanted to see

how Vargas's baby was, but he also knew Vargas did not have a driver's license. If Vargas had been driving, he would not have been legally permitted to do so.

{¶ 7} Mulcahy followed the car for a couple of minutes, just down the street, and did not see any traffic violations. The car proceeded into the driveway of an apartment complex and pulled into a parking space situated along the driveway. The space was one of several parking spaces marked diagonally along both sides of the driveway. Mulcahy stopped his cruiser behind the car in the middle of the driveway, not in a parking spot. The driver's side of Mulcahy's cruiser faced the rear of the car. Vargas got out of the passenger side of the car and began walking toward the cruiser. At that time, Mulcahy was still sitting in his cruiser with his arm up on the window. When Vargas walked up, he was free to leave, and when Mulcahy addressed Vargas, he used a conversational tone.

{¶ 8} Mulcahy had just intended to see how Vargas was doing, but he noticed something hanging out of Vargas's waistline that was immediately apparent to him as contraband based on his training and experience. The object was a plastic bag tied in a knot, a common practice of people who purchase or possess drugs, and was in the center of Vargas's waistband. The bag was clear but had a whitish tint as if it contained residue, which was consistent with Mulcahy's experience with packaged narcotics. In all the drug investigations in which Mulcahy had participated, he had never seen a similar baggie that did not contain drugs. As Vargas approached the cruiser, he drew his hands, which were holding items, close to his waist as if he was trying to hide what Mulcahy had already seen.

{¶ 9} Mulcahy got out of his cruiser, called dispatch to let them know where he was, and placed Vargas in handcuffs because he had probable cause to believe a crime was occurring. Mulcahy walked Vargas to the other side of his cruiser to separate him from the driver so that he could administer *Miranda* rights and talk to Vargas separately. Before

Mulcahy walked Vargas over to the other side of the cruiser, he grabbed the bag by the knots and pulled it out of the front of the waistband.

{¶ 10} The trial court found the encounter in the parking lot was consensual and that the drugs fell within the plain-view exception to the warrant requirement. Accordingly, the court overruled the motion to suppress. Vargas subsequently pled no contest to the second-degree felony charge and the forfeiture specification. The trial court imposed an indefinite sentence of two to three years in prison but stayed the sentence pending appeal. Vargas's timely appeal followed.

## II. Ruling on the Motion to Suppress

{¶ 11} Vargas's assignment of error asserts that the trial court's factual findings underpinning its decision of his motion to suppress were "clearly erroneous" and that he was seized in violation of the Fourth Amendment. He contends the video evidence shows that as he exited the car and walked across the parking lot, Detective Mulcahy pulled his cruiser into the apartment complex and impeded his path. According to Vargas, this caused him to feel that he was not free to leave and resulted in an illegal seizure without reasonable suspicion of criminal activity. Vargas argues that the encounter occurred in a non-public place, and so Mulcahy was not in a position where he was legally entitled to be under the plain-view doctrine. Before considering these points, we outline the applicable review standards and law pertaining to police-citizen encounters and warrantless searches.

### A. Review Standards

{¶ 12} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 2003-Ohio-5372, ¶ 8, citing *State v. Mills*, 62 Ohio

St.3d 357, 366 (1992). As a result, appellate courts must accept trial court findings of fact that "are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist. 1997).

B. Law Applying to Police-Citizen Encounters and Warrantless Searches

{¶ 13} Under the Fourth Amendment of the United States Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Ohio extends the same protection to people involved in felony cases based on Ohio Const., art. I, § 14. *State v. Jones*, 2015-Ohio-483, ¶ 12, citing *State v. Smith*, 2009-Ohio-6426, ¶ 10, fn. 1. "Under the Fourth Amendment, a warrantless search is per se unreasonable unless it falls into one of the few well-defined exceptions to the Fourth Amendment's warrant requirement. . . . When a motion to suppress evidence obtained in a warrantless search is filed, the state has the burden of establishing that one of the exceptions applies." *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 39, citing *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978).

{¶ 14} "A seizure for purposes of the Fourth Amendment occurs when law enforcement, through physical force or a display of authority, restrains a person's liberty of movement such that the person would believe they could not leave." *State v. Hale*, 2024-Ohio-4866, ¶ 14, citing *United States v. Mendenhall*, 446 U.S. 544, 553-554 (1980). However, "these guarantees are not implicated in every situation where the police have

contact with an individual." *State v. Taylor*, 106 Ohio App.3d 741, 747 (2d Dist. 1995), citing *California v. Hodari D.*, 499 U.S. 621 (1991), and *State v. Retherford*, 93 Ohio App.3d 586 (2d Dist. 1994).

{¶ 15} Three types of police and citizen interaction exist. "The first is referred to as a 'consensual encounter,' in which there is no restraint on the person's liberty. There need be no objective justification for such an encounter." *Retherford* at 594, citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991), and *Florida v. Royer*, 460 U.S. 491 (1983). In this situation, "officers may approach someone in a public place, identify themselves, ask whether the individual is willing to answer questions, and use any voluntary responses they receive in a criminal prosecution without the Fourth Amendment being implicated." *Id*. at 595, citing *Royer* at 497. "The second type, called 'detention,' involves a seizure of the individual for a limited duration and for a limited purpose. A constitutionally acceptable detention can occur 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' The third type involves seizures in the nature of an arrest, which may occur only if the police have probable cause to arrest a person for a crime." *Id*. at 594-595, quoting *Royer* at 498.

{¶ 16} The trial court found Mulcahy and Vargas's initial encounter was consensual. Vargas argues that the encounter was not consensual because he was in a private parking lot, i.e., a "non-public place," was "entirely blocked by the cruiser," and had "no choice but to try and walk around the vehicle in which a reasonable person would feel they were not free to do." Appellant's Br., p. 10. Vargas argues, therefore, that we should conclude that he was illegally "seized." *Id*. However, we disagree.

{¶ 17} "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of

authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19, fn. 16 (1968). The test in this situation is "whether a reasonable person would feel free to decline the . . . [officer's] requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. Further, "the 'reasonable person' test presupposes an *innocent* person"; it is not based on the state of mind of the person being approached. (Emphasis in original.) *Id*. at 438.

{¶ 18} In making this assessment, courts consider the totality of the circumstances. *Kaupp v. Texas*, 538 U.S. 626, 629 (2003); *Bostick* at 437. "Factors that might indicate a seizure include a threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking the citizen's path." *Taylor*, 106 Ohio App.3d at 748-749, citing *Mendenhall*, 446 U.S. at 554.

{¶ 19} Here, the encounter between Mulcahy and Vargas began in the parking lot of an apartment complex. However, Vargas did not live at the complex; his conversation with Mulcahy after the drugs were discovered revealed that Vargas lived in Xenia. Vargas would not have had an expectation of privacy with respect to the complex, much less its parking lot or other common areas. Mulcahy had as much lawful right to be in that area as any member of the public, including Vargas.

{¶ 20} As a passenger in the automobile, Vargas would have had standing to challenge the legality of a stop because when a vehicle is stopped, the driver and passengers are "equally seized and their freedom of movement is equally affected." *State v. Carter*, 69 Ohio St.3d 57, 63 (1994). However, Mulcahy did not stop the vehicle in which Vargas was riding, nor did he search the vehicle. Vargas was out of his vehicle and was

walking toward the police cruiser before the cruiser even came to a full stop. Furthermore, Mulcahy saw the bag with the drugs before he got out of his cruiser.

{¶ 21} Contrary to Vargas's claims, there is no evidence that Mulcahy obstructed his path. The trial court correctly concluded that Vargas voluntarily approached the cruiser. No show of force was made, no weapons were displayed, and no command was given. There was nothing of that nature. Vargas could have stayed in the vehicle or could have walked in any direction he wished. Instead, Vargas voluntarily got out of the car and walked toward the cruiser. Crucially, while still inside his cruiser, Mulcahy had spotted a plastic bag in Vargas's waistband that appeared to contain illegal drugs. Mulcahy and Vargas exchanged greetings, and then Mulcahy handcuffed Vargas. At that point, was Vargas clearly detained and not free to leave. Mulcahy told Vargas he was being detained because Mulcahy had seen something in plain view that should not be there.

{¶ 22} "Under the Fourth Amendment's plain-view doctrine, an officer may seize an object in plain view without a warrant if (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be viewed, (2) the object's incriminating nature is immediately apparent, and (3) the officer has a right to access the object where it is located." *State v. Burroughs*, 2022-Ohio-2146, ¶ 15, citing *Horton v. California*, 496 U.S. 128, 136-137 (1990). "A person does not have a legitimate expectation of privacy in an object that is in plain view." *State v. Jackson*, 2022-Ohio-4365, ¶ 26, citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

{¶ 23} Vargas's claim that he was seized in a non-public place concerns whether Detective Mulcahy was where he was lawfully allowed to be. "'[O]bservations of things in plain sight made from a place where a police officer has a right to be do not amount to a search in the constitutional sense. On the other hand, when observations are made from a

position to which the officer has not been expressly or implicitly invited, the intrusion is unlawful.'" *State v. Peterson*, 2007-Ohio-5667, ¶ 13 (2d Dist.), quoting *Lorenzana v. Superior Court*, 9 Cal.3d 626, 634 (1973).

{¶ 24} "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585 (1980), quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972). "The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home." *Peterson* at ¶ 17, citing *Oliver v. United States*, 466 U.S. 170, 180 (1984). "Because the curtilage of a property is considered to be part of a person's home, the right of the police to come into the curtilage is highly circumscribed. . . . Absent a warrant, police have no greater rights on another's property than any other visitor has. . . . . The only areas of the curtilage where the officers may go are those impliedly open to the public." *Id*., citing *State v. Woljevach*, 2005-Ohio-2085, ¶ 29 (6th Dist.). Notably, "the common parking lot areas of modern urban multi-family apartment dwellings are not considered part of the curtilage." *State v. Salyers*., 1979 WL 209753, *5 (5th Dist. Dec. 24, 1979), citing *Commonwealth v. Thomas*, 358 Mass. 771, 774 (1971). Vargas was not even a resident of the apartment complex where he encountered the detective.

{¶ 25} There is no doubt that police officers frequently and lawfully access the publicly accessible premises of apartment complexes for a variety of reasons, including normal patrols, drug interdiction investigations, responses to alleged criminal activity or complaints, and so forth. *E.g., State v. White*, 2011-Ohio-503, ¶ 2 (2d Dist.) (officers were patrolling "in and around" an apartment complex as members of the "Community Initiative to Reduce Gun Violence Task Force"). Likewise, civilians regularly visit the publicly accessible areas of apartment complexes, such as parking lots, for many reasons, including visiting residents,

delivering mail, dropping off deliveries of food or goods, and so on. Unless an apartment complex is closed to the public by gates, for example, permission for public access to common areas is implied. Mulcahy, just like Vargas, was lawfully present in the driveway of the apartment complex.

{¶ 26} "The requirement that the incriminating nature of the object be immediately apparent has been described as a probable cause requirement." *State v. Strothers*, 2000 WL 1867594, *2 (2d Dist. Dec. 22, 2000), citing *State v. Willoughby*, 81 Ohio App.3d 562, 569 (6th Dist. 1992). However, "probable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id*., quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In ascertaining the required probable cause to satisfy the 'immediately apparent' requirement, police officers may rely on their specialized knowledge, training and experience." *State v. Halczyszak*, 25 Ohio St.3d 301 (1986), paragraph four of the syllabus. Furthermore, the association with criminal activity "may arise from the character of the property itself." *Id*. at 304-305.

{¶ 27} During the suppression hearing, Mulcahy described his experience with drug investigations, the appearance of the bag, and Vargas's manner of carrying it, which were all consistent with possession of illegal drugs. Having reviewed Mulcahy's testimony and the State's exhibits, nothing casts any doubt on the trial court's findings of fact and conclusions of law. Nothing indicates that the initial encounter was anything but consensual and that, before Vargas was seized, Mulcahy saw an object in plain view that provided probable cause for the arrest. Accordingly, Vargas's assignment of error is overruled.

## III. Conclusion

**{¶ 28}** Vargas's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.